AO 91 (Rev. 11/11) Criminal Complaint AUSA Talia Bucci (815) 987-4444

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

UNITED STATES OF AMERICA

v.

TYJUAN ANDERSON, a.k.a. "Ace,"
LUMONT JOHNSON, a.k.a. "Skinny,"
CLEVELAND JOHNSON,
CHRISTOPHER ARNOLD,
JUSTIN HILL, a.k.a. "J Boo," and
DAVID APPLETON, a.k.a. "Boogie"

CASE NUMBER: 18 CR 50034
**UNDER SEAL**

FILED
JUL 10 2018
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

# CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

Beginning at least as early as in or about May 2018 and continuing through on or about July 10, 2018, at Rockford, in the Northern District of Illinois, Western Division, and elsewhere, the defendants violated:

| *Code Section* | *Offense Description* |
|---|---|
| Title 21, United States Code, Section 846 | did conspire with each other and with others known and unknown to knowingly and intentionally distribute and possess with intent to distribute a controlled substance, namely mixtures and substances containing a detectable amount of heroin, a Schedule I Controlled Substance, mixtures and substances containing a detectable amount of cocaine base, a Schedule II Controlled Substance, and mixtures and substances containing a detectable amount of cocaine, a Schedule II Controlled Substance, in violation of Title 21, United States Code, Section 841(a), all in violation of Title 21, United States Code, Section 846. |

This criminal complaint is based upon these facts:

X Continued on the attached sheet.

JEREMY K. SMITH
Special Agent, Federal Bureau of Investigation (FBI)

Sworn to before me and signed in my presence.

Date: July 10, 2018

*Judge's signature*

City and state: Rockford, Illinois

IAIN D. JOHNSTON, U.S. Magistrate Judge
*Printed name and Title*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS | ss

**AFFIDAVIT**

I, JEREMY K. SMITH, being duly sworn, state as follows:

1. I am a Special Agent with the Federal Bureau of Investigation. I have been so employed since approximately March 2017. I am currently assigned to the FBI's Rockford Resident Agency. My responsibilities include the investigation of controlled substances offenses, including but not limited to violations of Title 21, United States Code, Sections 841, 843(b), and 846.

2. I have received training in the enforcement of federal controlled substances laws, and I have been involved in numerous aspects of drug-trafficking investigations, including: (a) conducting surveillance; (b) analyzing documentary and physical evidence; (c) participating in undercover controlled substance investigations; and (d) debriefing defendants, informants, and witnesses who have knowledge of distribution and transportation of controlled substances and other drug-trafficking activities. Through my experience and training and discussions with other agents with experience investigating drug-trafficking offenses, I am familiar with methods drug traffickers use to conduct their business, including but not limited to: (a) their methods of obtaining and distributing illegal drugs; (b) their use of cellular telephones to conduct drug-trafficking activities; (c) their use of homes, businesses, and "stash houses" or "trap houses" to store illegal drugs and related materials and conduct meetings; (d) their use of vehicles to transport and store illegal drugs and to

conduct drug transactions; (e) their use of code words to conduct illegal drug transactions; and (f) their methods of concealing and laundering the proceeds of their illicit drug-trafficking enterprises. My experience has afforded me the opportunity to observe the methods, schemes, and operations used by individuals committing drug-trafficking offenses.

3. This affidavit is submitted in support of:

a. a criminal complaint alleging that TYJUAN ANDERSON, also known as "Ace," LUMONT JOHNSON ("LUMONT"), also known as "Skinny," CLEVELAND JOHNSON ("CLEVELAND"), CHRISTOPHER ARNOLD, JUSTIN HILL, also known as "J Boo," and DAVID APPLETON, also known as "Boogie," did conspire with each other and with others known and unknown to knowingly and intentionally distribute and possess with intent to distribute a controlled substance, namely mixtures and substances containing a detectable amount of heroin, a Schedule I Controlled Substance, mixtures and substances containing a detectable amount of cocaine base, a Schedule II Controlled Substance, and mixtures and substances containing a detectable amount of cocaine, in violation of Title 21, United States Code, Section 841(a), all in violation of Title 21, United States Code, Section 846; and

b. a criminal complaint alleging that ANGEL HERNANDEZ and CRISTOVAL SANTIAGO MEDINA did conspire with each other and with others known and unknown to knowingly and intentionally distribute and possess with intent to distribute a controlled substance, namely mixtures and substances

containing a detectable amount of heroin, a Schedule I Controlled Substance, in violation of Title 21, United States Code, Section 841(a), all in violation of Title 21, United States Code, Section 846.

4. The statements in this Affidavit is based on: (a) my personal participation in this investigation; (b) information provided to me by other law enforcement agents, including Winnebago County Sheriff's Police officers; (c) review of communications intercepted pursuant to a Title III order authorizing the interception of wire and electronic communications over two cell phones used by ANDERSON; (d) surveillance reports; (e) monitoring of surveillance cameras located in public areas; (f) information from confidential informants and review of audio and/or video records of controlled purchases of narcotics conducted by confidential informants; (g) review of pen register, trap and trace, and mobile-tracking device data; (h) review of third-party records; and (i) my training and experience and the training and experience of other law enforcement agents with whom I have consulted.

5. Because this Affidavit is being submitted for the limited purpose of establishing probable cause in support of the criminal complaints and issuance of arrest warrants for the defendants, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendants committed the offenses alleged in the complaints.

## I. OVERVIEW OF THE INVESTIGATION

6. The complaint is based on an investigation conducted by the Federal Bureau of Investigation ("FBI") and the Winnebago County Sheriff's Police ("WCSP") (collectively, "investigating agents") into the drug-trafficking activities of a drug-trafficking organization led by TYJUAN ANDERSON (hereafter, the "ANDERSON DTO") and its suppliers. As described in more detail below, the investigation has shown that the ANDERSON DTO is distributing narcotics, namely heroin, cocaine, and cocaine base ("crack cocaine"), in the Rockford area. This investigation also has shown that ANGEL HERNANDEZ and CRISTOVAL SANTIAGO MEDINA supplied heroin to ANDERSON on multiple occasions in May through June 2018.

7. The investigation into the ANDERSON DTO has included numerous undercover narcotics purchases, court-authorized interceptions of wire and electronic communications to and from two cell phones used by ANDERSON, physical and video surveillance, use of court-authorized mobile-tracking devices, analysis of data from court-authorized pen register and trap and trace devices, a seizure of narcotics from HERNANDEZ, and a court-authorized search of HERNANDEZ'S cell phone.

8. On May 22, 2018, District Court Judge Frederick J. Kapala issued an order authorizing the interception of wire and electronic communications to and from two cellular telephones used by ANDERSON, namely (779) 513-2200 ("**Target Phone 1**") and (901) 570-7517 ("**Target Phone 2**").[1]

[1] As explained below, investigating agents identified ANDERSON as the user of the **Target Phones** based on controlled purchases of narcotics conducted from ANDERSON that were arranged by contacting ANDERSON over one of the **Target Phones**, among other ways.

9. This Affidavit describes portions of recorded and unrecorded conversations, including conversations intercepted pursuant to the May 22, 2018 order. To the extent that such communications are summarized, those summaries do not necessarily refer to all of the topics covered during the conversation. In addition, the summaries do not include every conversation made by every speaker on the topic being described. Portions of the conversations that are quoted are based on preliminary quotations identified after listening to the conversations. The identity of the speakers also is preliminary. The quotations and identities of the speakers may be modified upon further review. For some conversations, I also have offered my understanding or interpretation of the conversation. My understandings and interpretations are based upon the content and context of the conversations, my knowledge of the investigation to date, my training and experience, and the experience of other investigating agents with whom I have consulted.

10. Over the course of this investigation, ANDERSON has used at least three vehicles to conduct drug-trafficking activities. The court has issued warrants and orders authorizing the installation and monitoring of tracking devices on those vehicles, namely: (1) a black 2002 GMC Yukon with VIN 1GKFK16Z02J124576 and bearing Illinois registration AQ63467 (“**Black GMC**”); (2) a silver or gray 2007 Buick sedan with VIN 1G4HP57237U135586 and bearing Illinois registration AL18887 (“**Gray Buick**”); and (3) a white Chevrolet Impala bearing at times Illinois temporary registration 994T246 or 994T421 (“**White Impala**”).

11. Over the course of this investigation, the court has issued orders authorizing the installation and use of pen register and trap and trace devices for **Target Phones 1-2** and cell phones used by LUMONT, CLEVELAND, MEDINA, and HILL.

12. On June 28, 2018, the court issued search warrants for 4420 Grinnell Drive, Apartment 3, Rockford, Illinois ("**Grinnell Apartment 3**") and 4420 Grinnell Drive, Apartment 5, Rockford, Illinois ("**Grinnell Apartment 5**"), both of which were associated with HERNANDEZ, for evidence, instrumentalities, fruits, and contraband of controlled substances offenses, in violation of Title 21, United States Code, Sections 841 and 846. The search warrants also authorized the search of a cell phone used by HERNANDEZ, namely the cell phone assigned phone number (414) 426-0267 ("**Hernandez's Phone**"), if located within the searched premises.

13. As further explained below, the search warrants for **Grinnell Apartment 3** and **Grinnell Apartment 5** were executed on the morning of July 2, 2018. HERNANDEZ and another male were located in **Grinnell Apartment 5**. Investigating agents also found over 4 kilograms of a brownish substance that field tested positive for the probable presence of heroin in a hall closet in **Grinnell Apartment 5**. Investigating agents also recovered **Hernandez's Phone** from the bedroom of **Grinnell Apartment 5**, where HERNANDEZ was found sleeping.

14. Investigating agents conducted physical and video surveillance over the course of the investigation. The surveillance cameras used in this investigation are mounted in public locations near areas relevant to the investigation.

## II. FACTS SUPPORTING PROBABLE CAUSE

### A. Summary of Probable Cause

15. As described in more detail below, the investigation has shown that the ANDERSON DTO distributes heroin, cocaine, and crack cocaine in the Rockford area. TYJUAN ANDERSON (also known as "Ace") is the leader of the ANDERSON DTO. ANDERSON obtained narcotics for the ANDERSON DTO from multiple suppliers, including ANGEL HERNANDEZ and CRISTOVAL SANTIAGO MEDINA. ANDERSON provided some of the narcotics he obtained from the suppliers to other members of the ANDERSON DTO, who in turn distributed the narcotics to their customers. As detailed below, during the course of the investigation, ANDERSON was intercepted on numerous occasions arranging drug transactions with suppliers; discussing with coconspirators the quality of narcotics the ANDERSON DTO was distributing, potential police surveillance of the ANDERSON DTO, and other drug-trafficking activities; and arranging drug transactions directly with certain street-level customers.

16. The investigation has shown that CHRISTOPHER ARNOLD and LUMONT JOHNSON (also known as "Skinny") are members of the ANDERSON DTO who assisted ANDERSON in obtaining narcotics from suppliers. I know from my training and experience and discussions with experienced agents, that drug traffickers commonly bring trusted members of their drug-trafficking organization to larger narcotics transactions, especially transactions with new or untrusted suppliers, in part to provide protection from being robbed or injured by the supplier

and in part to assist with looking out for potential police surveillance. As detailed below, on May 28, 2018 ANDERSON and LUMONT conducted a narcotics transaction with MEDINA in the parking lot of MEDINA'S residence. On June 6, 2018, ANDERSON and ARNOLD traveled to Elgin to meet with a new supplier to the ANDERSON DTO, and on June 19, 2018, ARNOLD and another male conducted counter-surveillance of a narcotics transaction between ANDERSON and HERNANDEZ and MEDINA using a drone.

17. The investigation also has shown that CLEVELAND JOHNSON is a member of the ANDERSON DTO who is obtaining narcotics from ANDERSON and redistributing the narcotics to customers. As detailed below, investigating agents intercepted communications between ANDERSON and CLEVELAND in which they alerted each other to potential police surveillance in the area, discussed pooling their resources for a future narcotics transaction, and discussed ANDERSON holding some narcotics for CLEVELAND on "standby."

18. The investigation also has shown that DAVID APPLETON is a member of the ANDERSON DTO. On multiple occasions in May 2018 and June 2018, APPLETON conducted narcotics transactions that had been previously arranged via telephone with ANDERSON. Intercepted communications and surveillance showed that APPLETON conducted those transactions at ANDERSON'S direction.

19. The investigation also has shown that ANDERSON and JUSTIN HILL are conspiring to distribute narcotics, including heroin and cocaine, in the Rockford area. The investigation has shown, among other things, that ANDERSON is

mentoring HILL on how to operate a successful drug trafficking business and avoid police surveillance. The investigation also has shown that, at times when ANDERSON has a low supply of narcotics, ANDERSON obtains narcotics from HILL. Investigating agents intercepted numerous communications in which ANDERSON and HILL discussed their available drug inventories and arranged to meet in order to exchange narcotics. Investigating agents also intercepted numerous communications in which ANDERSON advised HILL on managing his money, not selling certain types of narcotics (namely, fentanyl), and avoiding police surveillance.

### B. Controlled Purchases of Crack Cocaine from ANDERSON by CI-1.

20. In early 2018, Winnebago County Sheriff's Police arrested an individual (hereinafter "CI-1") for distributing crack cocaine in the Rockford area.[2] After CI-1's arrest, CI-1 advised an investigating agent that he/she had been buying crack cocaine from an individual CI-1 knew as "Ace." CI-1 described "Ace" as a black male in his 30s with a slim build who was recently acquitted of murder along with two other individuals. The agent recognized "Ace" from prior investigations as a nickname used

[2] CI-1 has multiple prior convictions for drug-trafficking and other felony offenses. CI-1 was arrested in early 2018 for drug trafficking. CI-1 has not been charged with an offense resulting from that arrest. CI-1 cooperated in this investigation in exchange for charging and/or sentencing consideration with respect to that arrest. CI-1 provided historical information regarding ANDERSON'S drug trafficking and participated in several controlled purchases of crack cocaine from ANDERSON. An investigating agent reviewed a recording of a controlled purchase CI-1 conducted on May 15, 2018 and observed CI-1 drink from a can that appeared to be for an alcoholic beverage while en route to meet with ANDERSON. On May 21, 2018, investigating agents readmonished CI-1 that he/she must not engage in criminal conduct, including consuming alcohol while driving. Investigating agents corroborated information CI-1 provided to agents through physical surveillance, consensual recordings, and intercepted communications, among other ways, and found CI-1's information to be reliable.

by ANDERSON, and the description CI-1 provided was consistent with known information about ANDERSON.[3]

21. CI-1 advised that he/she had been buying crack cocaine from "Ace" approximately every 3 days for the past 6 months. CI-1 explained that, to arrange the transactions, CI-1 contacted "Ace" by calling **Target Phone 1** and asking if he/she could "bump into" "Ace." CI-1 stated that "Ace" knew this to mean that CI-1 wanted to buy an "eight ball" of crack cocaine from "Ace." I know from my training and experience that an "eight ball" is a slang term meaning 1/8 of an ounce (approximately 3.5 grams) of a controlled substance. CI-1 stated that he/she paid ANDERSON $125 for each eight ball of crack cocaine. CI-1 explained that he/she would meet "Ace" in traffic, usually near Locust Street in Rockford, and that "Ace" usually drove a gray Buick sedan with tinted windows.

22. CI-1 provided the telephone number for **Target Phone 1** as "Ace's" phone number. Records obtained from the service provider, T-Mobile, show that **Target Phone 1** is subscribed to ANDERSON at 607 North Rockton Avenue, Rockford, Illinois 61103.

---

[3] WCCC online records show that in 2002, ANDERSON and two other individuals were charged in WCCC with murder. All three were convicted, but their convictions were later vacated. In 2015, ANDERSON and the other defendants were retried and found not guilty of all charges. ANDERSON later filed civil suit in the United States District Court for the Northern District of Illinois against the Rockford Police Department and several current and former Rockford Police officers relating to the vacated conviction. The district court granted summary judgement in favor of the defendants, and ANDERSON subsequently appealed. The appeal is currently pending before the United States Court of Appeals for the Seventh Circuit.

23. Since March 2018, investigating agents have conducted over 10 controlled purchases of crack cocaine from ANDERSON using CI-1. In each of the controlled purchases described in this Affidavit, investigating agents met with the confidential informant before and after the drug transaction. Investigating agents searched the informant and the informant's vehicle during each of those pre-transaction and post-transaction meetings. Investigating agents found no contraband or money in the informant's possession or vehicle during those searches unless otherwise noted below. Unless otherwise noted, the informant also was equipped with an audio and video recording device during each controlled purchase. In each controlled purchase, investigating agents collectively maintained surveillance of the informant during the controlled purchase, including as the informant traveled to and from the location of the planned transaction. Unless otherwise noted, investigating agents did not observe the informant meet with anyone other than the noted defendants during the controlled purchases.

***March 8, 2018 Controlled Purchases from ANDERSON***

24. On March 8, 2018, investigating agents conducted a controlled purchase of approximately 4.3 gross grams of crack cocaine from ANDERSON using CI-1. At approximately 11:35 a.m., CI-1 placed a recorded call to **Target Phone 1** to arrange the controlled purchase. During the call, CI-1 told "Ace" that CI-1 needed to "bump into you." "Ace" responded that he would "swing that way" in about 40-45 minutes. Based on my training and experience, the context of the conversation, and information from CI-1 about his/her prior dealings with "Ace," I believe that CI-1 was

telling "Ace" that CI-1 wanted to meet to buy crack cocaine from "Ace," and "Ace" was agreeing to meet with CI-1 to conduct the drug transaction in about 40-45 minutes.

25. About 32 minutes later, CI-1 placed another recorded call to **Target Phone 1**. CI-1 asked if "Ace" was on the way, and "Ace" responded that he was "going to get my stuff together" and then head "that way." "Ace" said that he would "hit" CI-1 when "Ace" was headed that way. Based on my training and experience and the context of the conversation, I believe that "Ace" was saying that he needed to package the crack cocaine for sale ("get my stuff together") and then meet up CI-1 to conduct the transaction, and that he would call ("hit") CI-1 when he was on the way to meet CI-1.

26. About 26 minutes later, CI-1 placed another recorded call to **Target Phone 1**. "Ace" answered and CI-1 asked where "Ace" wanted to meet. "Ace" directed CI-1 to go to the "Dollar Tree" that was "by the Social Security office." "Ace" stated that he would be there in about 7-10 minutes. CI-1 advised an investigating agent that, based on prior transactions with "Ace," CI-1 believed "Ace" was directing CI-1 to meet him at the Dollar Tree located on East Jefferson Street in Rockford. I know that Dollar Tree is located near a Social Security Administration office.

27. Investigating agents provided CI-1 with $125 in official funds to use to purchase narcotics from "Ace." CI-1 drove his/her vehicle to the Dollar Tree located on East Jefferson Street. Shortly after CI-1's vehicle pulled into Dollar Tree parking lot, an agent observed a gray Buick sedan with Illinois registration AL18887 (the **Gray Buick**) pull up next to CI-1's vehicle in the parking lot. According to a

search of a database commonly used by law enforcement, the registration number for the **Gray Buick** returned to ANDERSON at 607 North Rockton Avenue, Rockford, Illinois.

28. An investigating agent conducting surveillance observed a black male exit the **Gray Buick** and get into the front passenger seat of CI-1's vehicle. The agent identified the male as ANDERSON based on the investigating agent's prior review of a booking photograph of ANDERSON. ANDERSON remained in CI-1's vehicle for less than 2 minutes and then returned to the **Gray Buick**. The **Gray Buick** then drove out of the area, and CI-1 drove his/her vehicle to a predetermined location to meet with investigating agents.

29. When CI-1 met with agents after the transaction, CI-1 gave agents a tied-off baggie containing an off-white rock-like substance, which CI-1 stated was crack he/she had purchased from "Ace." The substance was later submitted to the Illinois State Police Rockford Forensic Science Laboratory ("ISP Lab") for testing. The laboratory results show that the substance contained cocaine and weighed 2.4 grams.[4] An investigating agent experienced in investigating drug-trafficking offenses recognized the substance as crack cocaine based on the substance's rock-like appearance and CI-1's course of dealing with ANDERSON.

---

[4] Based on my training and experience and discussions with other agents experienced in drug-trafficking investigations, I know that the ISP Lab does not routinely test for "cocaine base," as opposed to "cocaine," because Illinois's state controlled substances laws do not distinguish between cocaine and cocaine base.

30. On March 8, 2018, after the controlled purchase, an investigating agent showed CI-1 a booking photograph of ANDERSON without any visible identifying information. CI-1 identified the individual in the photograph as "Ace" and confirmed that the photographed individual was the person from whom CI-1 had just purchased crack cocaine.

***March 16, 2018 Controlled Purchase from ANDERSON***

31. On March 16, 2018, investigating agents conducted another controlled purchase of crack cocaine from ANDERSON using CI-1. Investigating agents met with CI-1 prior to the controlled purchase. Around 11:00 a.m., CI-1 placed a recorded call to **Target Phone 1** at the direction and in the presence of investigating agents. ANDERSON answered and said that he would meet CI-1 "in the alley in another 15-20 minutes." Investigating agents knew from CI-1's prior dealings with ANDERSON that "the alley" meant the alley near the intersection of Locust Street and Rockton Avenue, which runs directly behind a multi-family residence at 610 North Rockton Avenue, Rockford, Illinois.

32. As further explained below, investigating agents have identified Apartment 3 of 610 North Rockton Avenue, Rockford, Illinois (hereafter, "**Subject Premises 2**") as a "stash house" ANDERSON uses to conduct drug-trafficking activities. The investigation has shown that ANDERSON regularly conducts narcotics transactions in the alley directly behind **Subject Premises 2**, including several transactions with CI-1.

33. Investigating agents provided CI-1 with $125 in official funds to use to purchase narcotics from ANDERSON. CI-1 drove his/her vehicle to the alley near Locust Street and Rockton Avenue. A few minutes after CI-1 arrived in the alley, CI-1 contacted investigating agents and advised that "Ace" had called CI-1 and redirected him/her to the Dollar Tree. Investigating agents maintained surveillance as CI-1 drove to the Dollar Tree.

34. Shortly after CI-1 arrived in the Dollar Tree parking lot, an investigating agent observed a black 2002 GMC Yukon with VIN 1GKFK16Z02J124576 and bearing Illinois registration AQ63467 (the **Black GMC**) pull into the lot and park next to CI-1's vehicle. An investigating agent identified the driver of the **Black GMC** as ANDERSON. An agent observed ANDERSON exit the **Black GMC**, approach the driver's side window of CI-1's vehicle, and conduct a hand-to-hand exchange with CI-1 through the window of CI-1's vehicle. ANDERSON then returned to the **Black GMC** and drove out of the area.

35. Investigating agents maintained surveillance of the **Black GMC** after the transaction. The **Black GMC** traveled to a residence on Grove Street in Rockford and parked on the street outside the residence. An investigating agent observed ANDERSON exit the **Black GMC** and enter the front door of the residence Grove Street.

36. As further explained below, investigating agents observed ANDERSON coming and going from the residence on Grove Street on multiple occasions during this investigation. Investigating agents also observed the **Black GMC** and the **Gray**

**Buick** parked at or near the Grove Street residence numerous times since March 2018. In addition, investigating agents intercepted communications in which ANDERSON referred to the Grove Street residence as "my crib." On June 19, 2018, for example, ANDERSON advised ARNOLD to "[c]ome to my crib" (TP2 Session 1180), and agents monitoring a surveillance camera positioned near the Grove Street residence observed ARNOLD arrive at the Grove Street residence about 30-35 minutes later. Based on these sources of information, among others, investigating agents identified the Grove Street residence as ANDERSON'S residence (hereafter, "**Subject Premises 1**").

37. While some investigating agents continued surveillance of ANDERSON after the controlled purchase, other agents met with CI-1 at a predetermined location. CI-1 provided an investigating agent with a tied-off bag of an off-white rock-like substance. The substance was later submitted to the ISP Lab for testing. The laboratory results show that the substance contained cocaine and weighed 2.3 grams. An investigating agent experienced in investigating drug-trafficking offenses recognized the substance as crack cocaine based on the substance's rock-like appearance and CI-1's course of dealing with ANDERSON.

***March 21, 2018 Controlled Purchase from ANDERSON***

38. On March 21, 2018, investigating agents conducted another controlled purchase of crack cocaine from ANDERSON using CI-1. Around 11:30 a.m., CI-1 placed two recorded calls to **Target Phone 1**. The calls were not answered. A few minutes later, CI-1 received an incoming call from ANDERSON using **Target**

**Phone 1**. The conversation was recorded and overheard by investigators. CI-1 asked where he/she should meet, and ANDERSON responded, "I'm finna be [unintelligible] at Broadway in like 15 more minutes. I'm going to call you then. I'm going to probably have you come by the Dollar Store again or something." Investigating agents provided CI-1 with $125 in official funds. CI-1 then drove to the Dollar Tree on East Jefferson Street.

39. While some agents conducted surveillance of CI-1 as he/she drove to the Dollar Tree, other agents conducted surveillance of ANDERSON. An agent observed ANDERSON exit **Subject Premises 1** and get into the **Black GMC**, which was parked in front of **Subject Premises 1**. ANDERSON then drove out of the area.

40. Shortly after CI-1 pulled into the Dollar Tree parking lot, an investigating agent observed CI-1's vehicle travel to the west side of the Dollar Tree parking lot. The agent observed ANDERSON'S **Black GMC** pull up next to CI-1's vehicle on the side of the Dollar Tree. The agent observed ANDERSON exit the **Black GMC**, approach the driver's side window of CI-1's vehicle, and conduct a hand-to-hand exchange with CI-1 through the window of CI-1's vehicle. Both vehicles then drove out of the Dollar Tree parking lot.

41. Investigating agents continued surveillance of ANDERSON after the controlled purchase. Agents observed ANDERSON drive the **Black GMC** back to **Subject Premises 1** and park in the street in front of the residence. ANDERSON exited the **Black GMC** and entered the front door of **Subject Premises 1**.

42. While some investigating agents were surveilling ANDERSON, other agents met with CI-1 after the controlled purchase. CI-1 gave investigating agents a tied-off bag containing an off-white rock-like substance that CI-1 advised was "crack" he/she purchased from "Ace" in exchange for the funds provided by investigating agents. The substance was later submitted to the ISP Lab for testing. The laboratory results show that the substance contained cocaine and weighed 2.4 grams. An investigating agent experienced in investigating drug-trafficking offenses recognized the substance as crack cocaine based on the substance's rock-like appearance and CI-1's course of dealing with ANDERSON.

***April 3, 17 and 26, 2018 Controlled Purchases from ANDERSON***

43. On April 3, 2018, investigating agents conducted another controlled purchase of crack cocaine from ANDERSON using CI-1. CI-1 arranged the transaction by placing a recorded call to **Target Phone 1**. During the call, ANDERSON directed CI-1 to "meet me in the alley in like 10 minutes." Later that day, CI-1 met with ANDERSON in the alley directly behind **Subject Premises 2**. Shortly after CI-1 arrived in the alley, investigating agents observed the **Black GMC** enter the alley. Agents observed ANDERSON exit the **Black GMC** and approach CI-1's vehicle. ANDERSON remained near CI-1's vehicle for several minutes. ANDERSON then returned to the **Black GMC** and drove out of the area.

44. When CI-1 met with agents after the controlled purchase, CI-1 gave investigating agents a tied-off bag containing an off-white rock-like substance that CI-1 advised was "crack" he/she purchased from "Ace" in exchange for the funds

provided by investigating agents. The substance was later submitted to the ISP Lab for testing. The laboratory results show that the substance contained cocaine and weighed 2.7 grams. An investigating agent experienced in investigating drug-trafficking offenses recognized the substance as crack cocaine based on the substance's rock-like appearance and CI-1's course of dealing with ANDERSON.

45. On April 17, 2018, investigating agents conducted another controlled purchase of crack cocaine from ANDERSON using CI-1. At the direction and in the presence of investigating agents, CI-1 sent a text message to **Target Phone 1** stating, "YO" around 12:20 p.m. CI-1 did not receive a response to this text message. At approximately 12:24 p.m., CI-1 placed a call to **Target Phone 1**. The call was not recorded due to technical difficulties, but CI-1 held the phone in a way that allowed investigating agents to hear both sides of the phone conversation. During the call, ANDERSON directed CI-1 to the alley behind **Subject Premises 2**.

46. Later that day, CI-1 met with ANDERSON in that alley. Investigating agents observed ANDERSON drive into the area in the **Black GMC**. CI-1 and ANDERSON both exited their vehicles, conducted a hand-to-hand transaction, and talked outside their vehicles for about a minute. CI-1 then returned to his/her vehicle and drove to a predetermined location to meet with agents. Agents observed ANDERSON drive away from the area in his **Black GMC** a few minutes after CI-1 left.

47. When CI-1 met with investigating agents after the controlled purchase, CI-1 gave investigating agents a tied-off bag containing an off-white rock-like

substance that CI-1 advised was "crack" he/she purchased from "Ace" in exchange for the funds provided by investigating agents. The substance was later submitted to the ISP Lab for testing. The laboratory results show that the substance contained cocaine and weighed 2.5 grams. An investigating agent experienced in investigating drug-trafficking offenses recognized the substance as crack cocaine based on the substance's rock-like appearance and CI-1's course of dealing with ANDERSON.

48. On April 26, 2018, investigating agents conducted another controlled purchase of crack cocaine from ANDERSON using CI-1. Investigating agents met with CI-1 shortly after 11:00 a.m. that morning. CI-1 advised that he/she had talked with ANDERSON a short time earlier and ANDERSON was hanging out in the alley. Analysis of toll records and pen register and trap and trace data show that CI-1's phone contacted **Target Phone 1** shortly after 11:00 a.m. Less than a minute later, CI-1's phone received a call from **Target Phone 2**. These calls were not recorded or overheard by investigating agents.

49. Around 11:20 a.m., at the direction and in the presence of investigating agents, CI-1 placed a recorded call to **Target Phone 2**. ANDERSON answered. CI-1 asked if ANDERSON was ready, and ANDERSON replied "yep." CI-1 replied "ok here I come." Based on my training and experience, I believe that ANDERSON was confirming that he had crack cocaine ready to sell to CI-1.

50. Investigating agents provided CI-1 with $125 in official funds and directed CI-1 to use the funds to purchase crack cocaine from "Ace." CI-1 drove to the alley behind **Subject Premises 2**. ANDERSON'S **Black GMC** was already in the

alley when CI-1 arrived. An investigating agent observed ANDERSON exit the **Black GMC** and meet with CI-1, who also had exited his/her vehicle, in the alley. An agent observed ANDERSON and CI-1 conduct a hand-to-hand exchange and then remain in the alley talking for approximately five minutes. CI-1 then returned to his/her vehicle and drove to a predetermined location to meet with investigating agents. An agent observed ANDERSON leave the alley a few minutes later in the **Black GMC**.

51. When CI-1 met with investigating agents after the controlled purchase, CI-1 gave investigating agents a tied-off bag containing an off-white rock-like substance that CI-1 advised was "crack" he/she purchased from "Ace" in exchange for the funds provided by investigating agents. The substance was later submitted to the ISP Lab for testing. The laboratory results show that the substance contained cocaine and weighed 3.1 grams. An investigating agent experienced in investigating drug-trafficking offenses recognized the substance as crack cocaine based on the substance's rock-like appearance and CI-1's course of dealing with ANDERSON.

***May 29, 2018 Controlled Purchase from ANDERSON***

52. Investigating agents conducted another controlled purchase of crack cocaine from ANDERSON using CI-1 on May 29, 2018. Around approximately 10:30 a.m. that morning, CI-1 placed a call to **Target Phone 2** at the direction and in the presence of investigating agents. ANDERSON directed CI-1 to go to the "alley."

53. Investigating agents provided CI-1 with $125 in official funds and directed CI-1 to use the funds to purchase crack cocaine from "Ace." CI-1 then drove to the alley behind **Subject Premises 2**.

54. Investigating agents conducting surveillance near the alley observed ANDERSON meet with CI-1 briefly in the alley. An agent then observed ANDERSON go inside the rear entrance of 610 North Rockton Avenue. A short time later, ANDERSON exited 610 North Rockton Avenue and met with CI-1 again in the alley.[5] An agent observed ANDERSON and CI-1 conduct a hand-to-hand exchange. ANDERSON and CI-1 remained in the alley making small talk for a short time. CI-1 then got into his/her vehicle and drove to a predetermined location to meet with agents.

55. When CI-1 met with investigating agents after the controlled purchase, CI-1 gave agents a tied-off bag containing approximately 2.9 grams of an off-white rock-like substance that later field tested positive for the probable presence of cocaine. CI-1 advised that the substance was crack he/she had purchased from "Ace" with the funds investigating agents provided. An investigating agent experienced in investigating drug-trafficking offenses recognized the substance as crack cocaine based on the substance's color, field testing, and rock-like appearance.[6]

***June 8 and June 27, 2018 Controlled Purchases from ANDERSON***

56. On the afternoon of June 8, 2018, investigating agents conducted a controlled purchase of crack cocaine from ANDERSON using CI-1. Shortly before

[5] Investigating agents were not able to see which apartment unit inside 610 North Rockton Avenue ANDERSON went into. Records obtained from third parties as part of this investigation have shown that ANDERSON is renting and paying utilities for Apartment 3 in that building (**Subject Premises 2**).

[6] The substance CI-1 received from ANDERSON has been submitted to a lab for drug testing. The lab results have not yet been received.

noon, CI-1 called **Target Phone 2** at the direction and in the presence of investigating agents. ANDERSON answered and directed CI-1 to the "alley," which agents recognized to mean the alley behind **Subject Premises 2**. During the call, ANDERSON also indicated that the price would be $130.

57. Investigating agents provided CI-1 with $130 in funds and directed CI-1 to use the funds to purchase crack cocaine from "Ace." CI-1 then drove to the alley behind **Subject Premises 2**. Investigating agents observed CI-1 arrive in the alley around 12:05 p.m. At approximately 12:25 p.m., agents observed ANDERSON drive into the alley in the **Gray Buick**. ANDERSON and CI-1 exited their vehicles and conducted a hand-to-hand exchange. A short time later, CI-1 returned to his/her vehicle and drove to a predetermined location to meet with agents.

58. When CI-1 met with investigating agents after the controlled purchase, CI-1 gave agents a tied-off bag containing approximately 3.0 grams of an off-white rock-like substance that later field tested positive for the probable presence of cocaine. CI-1 advised that the substance was crack he/she had purchased from "Ace" with the funds investigating agents provided. An investigating agent experienced in investigating drug-trafficking offenses recognized the substance as crack cocaine based on the substance's color, field testing, and rock-like appearance.[7]

59. On June 27, 2018, investigating agents conducted another controlled purchase of crack cocaine from ANDERSON using CI-1. Around 12:30 p.m. that day,

[7] The substance CI-1 received from ANDERSON has been submitted to a lab for drug testing. The lab results have not yet been received.

CI-1 called ANDERSON on **Target Phone 2** at the direction and in the presence of investigating agents. During the call, ANDERSON instructed CI-1 to go to "the alley," which agents recognized to mean the alley behind **Subject Premises 2**.

60. Investigating agents provided CI-1 with $130 in funds and directed CI-1 to use the funds to purchase crack cocaine from "Ace." CI-1 then drove to the alley behind **Subject Premises 2**.

61. Investigating agents conducting surveillance near the 600 block of Rockton Avenue observed ANDERSON standing out front of the residence at 607 North Rockton Avenue, which is directly across the street from **Subject Premises 2**. Shortly after CI-1 arrived in the alley behind **Subject Premises 2**, an agent observed ANDERSON enter the front door the residence of 607 North Rockton Avenue (hereafter, "**Subject Premises 3**"). After about 2 minutes, ANDERSON exited **Subject Premises 3** and walked directly to the alley behind **Subject Premises 2**, where ANDERSON met with CI-1.

62. An investigating agent observed ANDERSON and CI-1 conduct a hand-to-hand exchange in the alley behind **Subject Premises 2**. After the transaction, ANDERSON walked directly back to **Subject Premises 3** and entered through the front door.

63. When CI-1 met with investigating agents after the controlled purchase, CI-1 gave agents a tied-off bag containing approximately 2.9 grams of an off-white rock-like substance that later field tested positive for the probable presence of cocaine. CI-1 advised that the substance was crack he/she had purchased from "Ace"

with the funds investigating agents provided. An investigating agent experienced in investigating drug-trafficking offenses recognized the substance as crack cocaine based on the substance's color, field testing, and rock-like appearance.[8]

### C. Drug Transactions Conducted Jointly by ANDERSON and APPLETON

64. As detailed below, ANDERSON and DAVID APPLETON jointly conducted or attempted to conduct multiple narcotics transactions in May through June 2018.

65. Investigating agents identified APPLETON based on agents' review of a booking photograph for APPLETON. Investigating agents identified APPLETON'S phone number as (779) 300-9028 (hereafter, "**Appleton's Phone**") based on subscriber records for **Appleton's Phone** and a social media search showing that **Appleton's Phone** number is linked to a social media account for APPLETON. In addition, over the course of this investigation, agents have intercepted numerous communications between the **Target Phones** and **Appleton's Phone**, and agents have observed APPLETON taking actions consistent with intercepted communications, such as traveling to a certain location or meeting with ANDERSON, shortly after those communications on multiple occasions, as described below.

[8] The substance CI-1 received from ANDERSON has been submitted to a lab for drug testing. The lab results have not yet been received.

***ANDERSON'S and APPLETON'S Attempted Narcotics Transaction with Customer A on May 25, 2018***

66. On May 25, 2018, investigating agents intercepted calls between ANDERSON and one of his narcotics customers ("Customer A") attempting to arrange a narcotics transaction. As detailed below, ANDERSON then contacted DAVID APPLETON to retrieve narcotics from a residence located at 509 Locust Street, Rockford, Illinois ("**Subject Premises 4**") to give to Customer A. Customer A, however, declined to buy narcotics from APPLETON because Customer A did not know APPLETON and had not obtained drugs from APPLETON on prior occasions.

67. On May 25, 2018, at approximately 3:47 p.m., investigating agents intercepted the following call between ANDERSON on **Target Phone 2** and Customer A:

| | |
|---|---|
| ANDERSON: | Yo? |
| CUSTOMER A: | Yo? What up, brotha? |
| ANDERSON: | What's good, bro? |
| CUSTOMER A: | Uh, I'mma be, I'mma be coming through here in about 15 minutes or so. |
| ANDERSON: | What you tryin' to check out? |
| CUSTOMER A: | Uh, just like 4 or 5 of em…check it out. |
| ANDERSON: | Alright. |
| CUSTOMER A: | Is it good? |
| ANDERSON: | Yep. |

CUSTOMER A: Alright, yeah I'm coming from, uh, I'm coming from, uh, other side of Rockford over, over here. I'll be over there in like 15 minutes.

ANDERSON: Alright.

CUSTOMER A: Alright, yep.

(TP 2 Session 87). Based on my training and experience, I believe Customer A was requesting four to five grams of narcotics from ANDERSON.

68. At approximately 4:00 p.m., ANDERSON on **Target Phone 2** placed a call to **Appleton's Phone**. The following conversation was intercepted:

APPLETON: Hey, what's going on?

ANDERSON: Nothing much. Hey, I got something, I got something lined up (stutters)—I'mma need you (UI). We can get it done real quick, alright?

APPLETON: Ok.

ANDERSON: I probably hit you in about 10 minutes. I'm just going to have you shoot, shoot up the street a little bit on, on, on Kizzo and Lizzo.

APPLETON: Ok.

ANDERSON: So when they, when they on they way, I'mma hit you, alright?

APPLETON: Ok.

(TP2 Session 90)

69. At approximately 4:07 p.m., **Target Phone 2** received a text message from Customer A stating "Few mins". (TP2 Session 91) ANDERSON immediately contacted APPLETON and stated, "Shoot up, shoot up to that, shoot up to that crib I

got over there on, uh, Court and Locust. That crib on the porch, go on the porch real quick." APPLETON replied, "Ok." (TP2 Session 92)

70. At approximately 4:09 p.m., agents intercepted a call between ANDERSON and Customer A over **Target Phone 2**. During the conversation, ANDERSON instructed Customer A to "com[e] up Rockton the normal way you be coming. Turn left and come down to the, to uh, Locust." (TP2 Session 96)

71. At approximately 4:13 p.m., ANDERSON contacted **Appleton's Phone**, and had the following conversation with APPLETON:

| | |
|---|---|
| APPLETON: | Hello? |
| ANDERSON: | Where you at, Unc? |
| APPLETON: | Yeah, I'm coming up Locust. |
| ANDERSON: | Alright. You almost on the (pause)—You almost at the crib? |
| APPLETON: | Yeah |
| ANDERSON: | When you get in the crib look in that white garbage can, in that, in that Lifesaver bag, in that blue, in that blue wrapping and grab that up out of there. |
| APPLETON: | Ok. |
| ANDERSON: | Alright. |
| APPLETON: | Yep. |
| ANDERSON: | And just sit on the porch. (Unintelligble) they finna to pull up. |
| APPLETON: | Ok. |

(TP2 Session 99)

72. At approximately 4:14 p.m., surveillance units observed ANDERSON stop in the area of **Subject Premises 4**. ANDERSON was seen exiting his vehicle and approaching **Subject Premises 4**. After a short amount of time, ANDERSON got back in his car. ANDERSON then pulled into a nearby parking lot, facing **Subject Premises** 4, and appeared to be conducting counter-surveillance of **Subject Premises 4**.

73. At approximately 4:17 p.m., ANDERSON called **Appleton's Phone** and asked, "Where you at, man?" APPLETON informed ANDERSON that he was on the porch. ANDERSON then told APPLETON to go into the white garbage can on the porch and look in the bag. APPLETON was unable to locate the item. ANDERSON asked again where APPLETON was located. APPLETON responded, "I'm on the porch where I sit at." ANDERSON replied, "No, on Locust at my shit, down here at Locust and Court." ANDERSON told APPLETON to call when APPLETON "g[o]t down there on Court." (TP2 Session 103) Around the end of this call, agents monitoring a surveillance camera observed a black male running from behind **Subject Premises 2** toward the direction of **Subject Premises 4**.[9]

74. About 3 minutes later, ANDERSON called **Appleton's Phone** again. APPLETON stated that he was at Locust and Court and stated, "I don't know where your joint is." ANDERSON responded, "That one right on the corner. The one that has the bullet holes in it." APPLETON asked "You talkin' about the white house there with the enclosed porch." ANDERSON replied, "Yeah." A short time later,

[9] **Subject Premises 4** is approximately 1/5 of a mile from **Subject Premises 2**.

APPLETON stated "Ok, I see the white garbage can, yep and the bag, yep, I got it, in the bag." ANDERSON asked, "You got it right?" And APPLETON responded, "Yep, I got it in my hand. Yep, I sure do." ANDERSON responded, "Alright. Hold it, hold it." (TP2 Session 104).

75. At approximately 4:22 p.m., ANDERSON received a call on **Target Phone 2** from Customer A. Customer A asked, "Where you at bro?" ANDERSON responded, "You keep just pulling up and snatching out. Somebody right there waiting on you." Customer A asked, "Somebody waiting on me?" And ANDERSON confirmed. Customer A became agitated and said, "I don't know anyone else man, ya know" and "Yeah, I don't wanna fuck with anyone else bro." ANDERSON tried to reassure Customer A, saying "Just turn, man, just turn, you gonna see them. They right there. You on my line. You on my line." Customer A responded, "Yeah, but I don't—I don't know them, you know what I'm saying? I don't know who they are." ANDERSON again tried to reassure Customer A, stating, "If I'm sending them to you, you cool." But Customer A continued to say, "I don't want to fuck with anybody else." (TP2 Session 106) Customer A was subsequently seen by surveillance units leaving the area.

76. Based on the context of the above-described calls, as well as my training and experience, I believe ANDERSON directed APPLETON to get narcotics ANDERSON was storing at **Subject Premises 4** to sell to Customer A, but the transaction ultimately did not occur because Customer A was wary about buying narcotics from someone other than ANDERSON. I believe that ANDERSON'S

statements to Customer A, including "You on my line" and "If I'm sending them to you, you cool," meant that the individual to whom ANDERSON was sending Customer A (*i.e.,* APPLETON) was part of ANDERSON'S drug-trafficking organization.

77. Based on a combination of physical surveillance and the intercepted calls, I also believe that ANDERSON was conducting counter-surveillance of the planned transaction with Customer A to try to identify potential police surveillance in the area. In fact, about 15 minutes after the events described above, ANDERSON using **Target Phone 2** called (779) 774-0039 and discussed potential police surveillance with the user of (779) 774-0039, who agents previously had identified as CLEVELAND JOHNSON (*see* paragraph 122 n.15 below). ANDERSON and CLEVELAND had the following conversation:

| | |
|---|---|
| CLEVELAND: | Hello? |
| ANDERSON: | What happening, cuz? |
| CLEVELAND: | What it is, cuz? |
| ANDERSON: | What chu on? |
| CLEVELAND: | Man, sitting my ass right here god dammit on the bliz-nock [block]. |
| ANDERSON: | Okay. It's a tan 4-door pickup truck, right? |
| CLEVELAND: | Yeah. |
| ANDERSON: | It got like, I think it's, I think it's —it's a Z71, that's (U/I), you hear me? |
| CLEVELAND: | Okay. What it's rolling around here? |

| | |
|---|---|
| ANDERSON: | Yep. |
| CLEVELAND: | Okay. I'm finna god dammit—I'm finna god dammit, um, put mother fuckers on their toes. |
| ANDERSON: | Yep, it's lie a tannish, Z71, 4-door pickup truck. One white boy in it. |
| CLEVELAND: | Okay. I got you cuz. |
| ANDERSON: | Alright. |
| CLEVELAND: | Love, cuz. |

(TP2 Session 111) I believe that ANDERSON was telling CLEVELAND about a potential police surveillance vehicle in the area, and CLEVELAND advised that he would tell their associates to be on the lookout for potential surveillance ("put mother fuckers on their toes").

***ANDERSON'S and APPLETON'S Narcotics Transaction on June 2, 2018***

78. On the evening of June 2, 2018, around 8:00 p.m., investigating agents intercepted a call to **Target Phone 2** from Customer A. Customer A asked if ANDERSON "was good". ANDERSON said, "Yeah." Customer A said, "I'm gonna grab uh 5 of them, alright?" Customer A also said, "I'm not that far. I'm like 15 or 20 minutes out." (TP2 Session 463)

79. A few minutes later, ANDERSON, using **Target Phone 2**, called **Appleton's Phone**. During the call, ANDERSON advised that he was going to "need" APPLETON. APPLETON responded, "Yeah. Whenever you need me, I'mma be right there." ANDERSON told APPLETON that someone was "coming now" and was going to be there in "10 minutes." APPLETON asked if ANDERSON wanted him to come

now, and ANDERSON said, "Yup." APPLETON responded, "Alright, here I come." (TP2 Session 464)

80. At approximately 8:20 p.m., Customer A texted **Target Phone 2** "Do 6" followed by "10 min". (TP2 Sessions 465, 466)

81. At approximately 8:27 p.m., ANDERSON called **Appleton's Phone** and asked where APPLETON was. APPLETON responded that he was on the way. (TP2 Session 467)

82. At approximately 8:30 p.m., ANDERSON received a call from Customer A on **Target Phone 2**. Customer A stated that, "I'm in my van. I'm right here." (TP2 Session 469)

83. Around that same time, investigating agents collectively observed the following: A white minivan pulled into the alley behind **Subject Premises 2**, where investigating agents regularly observed ANDERSON conduct narcotics transactions. ANDERSON pulled up near the intersection of Locust Street and Rockton Avenue, which is by the southern end of the alley that runs behind **Subject Premises 2**, in a **White Impala**. APPLETON exited the front passenger seat of the **White Impala** and ran behind the building at 610 North Rockton Avenue. A short time later, APPLETON returned to the intersection of Locust Street and Rockton Avenue and got back into the front passenger seat of the **White Impala**. The white minivan exited the alley behind **Subject Premises 2** shortly thereafter.

84. Based on my training and experience, my knowledge of the investigation, and the intercepted calls and surveillance described above, I believe

that APPLETON, at the direction of ANDERSON, distributed narcotics to Customer A in the alley behind **Subject Premises A**.

***June 8, 2018 Controlled Purchase of Heroin from ANDERSON and APPLETON***

85. On June 8, 2018, investigating agents conducted a controlled purchase of heroin from ANDERSON using a confidential informant ("CI-3").[10] Prior to June 8, 2018, CI-3 had advised investigating agents that he/she had been purchasing heroin from a black male off of Rockton Avenue in Rockford for over a year. CI-3 did not know the black male's name, but CI-3 provided the telephone number to **Target Phone 2** as the male's telephone number. CI-3 explained that he/she usually bought heroin from the black male in an alley that matched the description for the alley behind **Subject Premises 2**. CI-3 stated that he/she paid $100 per gram of heroin.

86. Investigating agents met with CI-3 on the morning of June 8, 2018. Shortly after 11:00 a.m., CI-3 placed a call to **Target Phone 2** at the direction and in the presence of investigating agents. ANDERSON answered. CI-3 told ANDERSON that he/she "hoping to come through and grab 5 of em [grams of heroin]." ANDERSON responded, "Alright." ANDERSON told CI-3 to "give me like 15." (TP2

[10] CI-3 was arrested by Winnebago County Sheriff's Police for a narcotics offense in 2018. CI-3 has not been charged with an offense resulting from the arrest. CI-3 is cooperating in this investigation in exchange for charging and/or sentencing consideration with respect to that arrest. CI-3 is a heroin addict and has prior criminal convictions, but none within the last 10 years. CI-3 provided historical information regarding ANDERSON'S drug trafficking, and CI-3 participated in controlled purchases of heroin in this investigation. Investigating agents corroborated CI-3's information through physical surveillance, consensual recordings, and intercepted communications, among other ways, and agents have found CI-3's information to be reliable. Additional information regarding CI-3 is included in a separate *ex parte* filing.

Session 710) Investigating agents provided CI-3 with $500 in advance funds and directed CI-3 to use the funds to purchase heroin. CI-3 then drove to the alley behind **Subject Premises 2.**[11]

87. Immediately after the call between CI-3 and ANDERSON, investigating agents intercepted a call from ANDERSON on **Target Phone 2** to **Appleton's Phone**. During the call, ANDERSON stated, "I need you to come swing on me so we can bust these moves." APPLETON responded, "Okay, yeah, yeah, alright." ANDERSON stated that he would "be over there in like 10 minutes." APPLETON asked, "Alright, you want me to meet you over on, at the house?" And ANDERSON responded, "Yup, yup, yup." (TP2 Session 711).

88. About 15 minutes later, CI-3 called **Target Phone 2** and advised ANDERSON that he/she would "be pullin up here in a couple minutes." (TP2 Session 712) ANDERSON then immediately called **Appleton's Phone** and asked where APPLETON was. APPLETON responded, "I'm right here on Horseman and Locust, here I come." ANDERSON replied, "Alright, alright, I'm pullin down that way now." (TP2 Session 713)

89. ANDERSON and APPLETON exchanged two additional calls indicating that they met up near the intersection of Locust and Woodlawn around 11:25 a.m. (TP2 Sessions 714, 717) At approximately 11:27 a.m., an investigating agent observed ANDERSON drive up near **Subject Premises 2** in ANDERSON'S **Gray Buick**. A

[11] Investigating agents followed the same procedures described above in paragraph 23 when conducting the controlled purchases with CI-3.

short time later, another investigating agents observed APPLETON wearing a red hooded sweatshirt approach CI-3 on foot. APPLETON and CI-3 conducted a hand-to-hand exchange through the driver's side window of CI-3's vehicle. After meeting with CI-3, APPLETON left the alley on foot and walked over to ANDERSON'S **Gray Buick**, which was parked less than a block away from **Subject Premises 2**.

90. A short time later, CI-3 drove to a predetermined location to meet with investigating agents. When CI-3 met with investigating agents after the controlled purchase, CI-3 gave agents a tied-off bag containing approximately 5.2 gross grams of a brown chunky substance, a portion of which later field tested positive for the probable presence of heroin. CI-3 advised that the substance was heroin he/she had purchased from the older black male wearing a red hooded sweatshirt with the funds investigating agents provided.[12]

***June 14, 2018 Controlled Purchase of Heroin from ANDERSON and APPLETON, Who Were Supplied in Part by HILL***

91. On June 14, 2018, investigating agents conducted another controlled purchase of heroin from ANDERSON using CI-3. Investigating agents met with CI-3 prior to the controlled purchase. At approximately 12:39 p.m., CI-3 called ANDERSON on **Target Phone 2** at the direction and in the presence of investigating agents. ANDERSON did not answer.

92. At approximately 12:42 p.m., ANDERSON, on **Target Phone 2**, called **Appleton's Phone**. During the call, ANDERSON asked where APPLETON was.

[12] The substance CI-3 received from ANDERSON has been submitted to a lab for drug testing. The lab results have not yet been received.

ANDERSON stated that he had to "get this shit together real quick." ANDERSON also told APPLETON, "I'm gonna hit you. I'm gonna need you." APPLETON replied, "Okay." (TP2 Session 975) Based on prior investigation of ANDERSON, I believe he was informing APPLETON that he would need him to sell CI-3 narcotics.

93. At approximately 12:43 p.m., ANDERSON, again on **Target Phone 2**, called telephone number (815) 601-4732, which investigating agents identified as being used by JUSTIN HILL as explained below (*see* paragraph 170 below). After briefly exchanging small talk, HILL asked, "You need me?" ANDERSON responded, "Yeah. You got that tizzou. You still got the tizzou, right?" HILL responded, "Yep." Later in the call, ANDERSON asked, "How long is it gonna take you to get it, man?" HILL stated that he was not driving and would need ANDERSON to "take [him] to get it." ANDERSON responded, "Alright, come on." Later in the call, ANDERSON stated that he had "something lined up, right now, probably for about a fin." HILL responded, "You going to let me get it? I need it." ANDERSON replied, "That's what I'm saying. That's what I'm calling you for." HILL then said that he would get dropped off by ANDERSON. (TP2 Session 979) Based on my training and experience, as well as the training and experience of other investigating agents, I believe ANDERSON was asking if HILL still had 2 ounces "tizzou" of heroin available because ANDERSON had customer (CI-3) who wanted to buy 5 grams. I believe that ANDERSON believed CI-3 wanted to purchase 5 grams of heroin based on CI-3's prior transactions with ANDERSON.

94. At approximately 12:45 p.m., ANDERSON, on **Target Phone 2**, called CI-3 back. During the call, CI-3 asked ANDERSON if he/she could "come through on 5 [grams of heroin]." ANDERSON agreed and told CI-3 that he would need "about 30." (TP2 Session 980) Investigating agents provided CI-3 with $500 in official funds to use to purchase narcotics from ANDERSON. CI-3 then drove to the alley directly behind **Subject Premises 2**.

95. At approximately 1:16 p.m., ANDERSON, on **Target Phone 2**, called **Appleton's Phone**. During the call, ANDERSON instructed APPLETON to meet him by the alley near Rockton and Woodlawn. APPLETON replied, "Okay." (TP2 Session 985)

96. Data from a tracking device installed on ANDERSON'S **Gray Buick** pursuant to a federal warrant showed that, around this same time, the **Gray Buick** traveled to a residence on Gladstone Avenue in Rockford (hereafter, "**Subject Premises 6**"). The data showed that the **Gray Buick** arrived at **Subject Premises 6** at approximately 1:16 p.m. and remained there until approximately 1:19 p.m.

97. Over the course of the investigation, investigating agents identified **Subject Premises 6** as HILL'S residence based on driver's license information for HILL, according to an Illinois Secretary of State database, and visual surveillance of HILL at **Subject Premises 6** on multiple occasions.

98. At approximately 1:17 p.m., ANDERSON received a call from CI-3. During the call, ANDERSON advised that he was 4 minutes away. (TP2 Session 986)

99. At approximately 1:23 p.m. and 1:24 p.m., ANDERSON attempted to contact APPLETON, but was unsuccessful. At 1:25 p.m., tracking-device data showed that the **Gray Buick** was located near the intersection of Woodlawn Avenue and Locust Street, where ANDERSON previously had told APPLETON to meet him. About one minute later, ANDERSON called CI-3 and asked, "You there, bro?" CI-3 responded, "I'm gonna be pulling back around here in 1 minute." (TP2 Session 989)

100. At approximately 1:27 p.m., surveillance units observes ANDERSON drop APPLETON off near **Subject Premises 2** in ANDERSON'S **Gray Buick**.

101. At 1:28 p.m., ANDERSON contacted **Appleton's Phone**. APPLETON answered, "Shit, I got him." (TP2 Session 990) Around this time, an investigating agent observed APPLETON approach CI-3's vehicle in the alley behind **Subject Premises 2** and make a hand-to-hand exchange with CI-3. APPLETON then left the alley on foot.

102. Following the transaction, CI-3 left the area and was followed by investigating agents to a predetermined location. CI-3 provided investigating agents with a tied-off plastic bag that he/she said was heroin purchased from an older black male. Investigating agents later weighed and field-tested the substance. The substance weighed approximately 5.4 gross grams, and a portion of the substance field-tested positive for the probable presence of heroin.[13]

---

[13] The substance CI-3 received from ANDERSON has been submitted to a lab for drug testing. The lab results have not yet been received.

103. At approximately 1:30 p.m., ANDERSON called **Appleton's Phone** and instructed APPLETON to "come down to Locust" because he was "at the other crib right now." (TP2 Session 992) I believe ANDERSON was directing APPLETON to go to **Subject Premises 4** to deliver the money APPLETON had received from CI-3 to ANDERSON.

**D. ANDERSON'S Narcotics Transactions with HERNANDEZ and MEDINA**

104. The investigation showed that ANDERSON was supplied with narcotics by MEDINA and/or HERNANDEZ on May 28, 2018 and June 19, 2018. As further explained below, ANDERSON and LUMONT JOHNSON went to the May 28, 2018 transaction together, and ANDERSON had CHRISTOPHER ARNOLD and another male conduct drone surveillance of ANDERSON'S June 19, 2018 transaction with HERNANDEZ and MEDINA. The investigation also showed that ANDERSON had numerous conversations with ARNOLD, MEDINA, and others regarding the quality of the narcotics ANDERSON obtained during the June 19, 2018 transaction with HERNANDEZ and MEDINA.

***May 28, 2018 Transaction by ANDERSON and LUMONT with MEDINA and HERNANDEZ and ANDERSON'S Subsequent Conversations and Meeting with CLEVELAND***

105. In the early morning hours of May 28, 2018, investigating agents intercepted multiple text messages from telephone number (815) 329-9931 to **Target Phone 1**. As explained below, agents subsequently identified MEDINA as the user of the cell phone assigned (815) 329-9931 (hereafter, "**Medina's Phone**"). The text messages from **Medina's Phone** to **Target Phone 1** stated:

2:38:09 a.m.: Yo

2:44:53 a.m.: Hit me up ASAP

2:45:48 a.m.: Got sumn u might b able to work with it[.]

(TP1 Sessions 619, 621, 623)

106. At approximately 9:06 a.m. that morning, investigating agents intercepted a call from **Target Phone 1** to **Medina's Phone**. The following conversation was intercepted:

| | |
|---|---|
| MEDINA: | What's up Ace? |
| ANDERSON: | What's good with it bro? |
| MEDINA: | Chillin chillin. Just got back out from Calia last night bro. |
| ANDERSON: | It's good? |
| MEDINA: | Yeah, but it's something different though bro. You know what I mean? |
| ANDERSON: | It's decent though? |
| MEDINA: | Yeah, I think you'd be able to work with that shit, get it off though, you know what I'm sayin? Band, talking bout like 6 bricks though you know what I'm sayin? Nigga took like 9 zones off of that so, motha fucka trying to get rid of that shit, get it on for the low. |

ANDERSON and MEDINA then discussed meeting up later in the day. MEDINA added later in the call, "It's decent but it could use something, you know what I'm saying? Might be able to work with it bro, so we'll see. We'll see bro." (TP1 Session 630) I believe that ANDERSON and MEDINA were discussing meeting up so that MEDINA could supply ANDERSON with narcotics.

107. At approximately 11:10 a.m., investigating agents intercepted a call from **Medina's Phone** to **Target Phone 1**.[14] During the call, ANDERSON and MEDINA discussed where they would meet. ANDERSON asked, "Where at though? Where I came that time?" MEDINA responded, "Yeah, Harrison brother yep same spot." ANDERSON said that he would "be there in about 15 minutes." (TP1 Session 665)

108. Video surveillance showed that, shortly before 11:30 a.m., ANDERSON, LUMONT, and a female believed to be ANDERSON'S girlfriend left **Subject Premises 1** and drove away in the **White Impala**. Investigating agents conducting physical surveillance observed ANDERSON drive the **White Impala** to the 600 block of North Rockton Avenue, and park the **White Impala** on the street near where ANDERSON'S **Gray Buick** was parked. Investigating agents observed ANDERSON and LUMONT shuffle unknown items between the **White Impala** and the **Gray Buick**.

109. While some investigating agents were conducting surveillance of ANDERSON, another agent established surveillance near MEDINA'S residence, which agents identified as an apartment unit on Harrison Avenue (hereafter "**Subject Premises 5**") based on a search of a local law enforcement database. A short time after the agent arrived, the agent observed MEDINA into the parking lot of **Subject Premises 5** in a black Pontiac Bonneville. The agent recognized

[14] Because of a technical issue, investigating agents were unable to hear the initial portion of this communication.

MEDINA, who was the only occupant of the Bonneville, from the agent's review of a booking photograph and social media photograph of MEDINA. The agent observed MEDINA remove several items from the Bonneville. One of the items was a black coffee mug with silver trim. The agent observed MEDINA unzip his pants and slide the mug into the groin area of his pants. MEDINA then walked over to a black Cadillac sedan, opened the driver's side door, removed the mug from his groin area, and placed it in the Cadillac. The agent then observed MEDINA enter **Subject Premises 5**.

110. Shortly after 11:40 a.m., video surveillance showed ANDERSON exit 610 North Rockton Avenue (the building where **Subject Premises 2** is located) and approach the **White Impala**. ANDERSON was carrying a folded-up grocery bag in his hand.

111. Around approximately 11:42 a.m., investigating agents intercepted a call from **Target Phone 1** to **Medina's Phone**. During the call, ANDERSON advised that he was "on his way to you right now." MEDINA stated that he was "leaving the store now," going to go to the Walgreens, and would then head home. (TP1 Session 681)

112. Around the same time that this call occurred, an investigating agent observed MEDINA near a store on South Alpine Road. The agent then observed MEDINA travel to a Walgreens for a brief time and then back to **Subject Premises 5**. MEDINA remained out in the parking lot of **Subject Premises 5**, putting air into the tires of the Bonneville and Cadillac sedan.

113. At approximately 11:52 a.m., video surveillance showed the **White Impala** leave the 600 block of North Rockton Avenue. ANDERSON was driving and there was a passenger in the front seat, who agents identified as LUMONT when the vehicle arrived at MEDINA'S residence.

114. At approximately 12:10 p.m., investigating agents intercepted another call from **Target Phone 1** to **Medina's Phone**. ANDERSON said, "Hey, I'm pulling up right now bro." After an unintelligible response from MEDINA, ANDERSON then stated, "Hey, uh, I forgot which one it was [U/I] I see you right here." (TP1 Session 687) Around that same time, investigating agents observed ANDERSON and LUMONT arrive in the parking lot of **Subject Premises 5** in the **White Impala**.

115. An agent observed MEDINA walk over to the Cadillac sedan and remove the coffee mug from the vehicle. MEDINA then got into the back seat of the **White Impala**. An agent observed MEDINA exchanging something with someone in the front seats of the **White Impala**. MEDINA remained in the **White Impala** for about 20 minutes. A tan Nissan sedan with Illinois registration 836387 then pulled up near the **White Impala**. MEDINA exited the **White Impala** and got into the tan Nissan. An agent identified the driver and only other occupant of the Nissan as HERNANDEZ, based on the agent's review of a driver's license photograph for HERNANDEZ. The tan Nissan (hereafter, "**Hernandez's Nissan**") traveled through the parking lot, out of sight of the **White Impala**. An agent observed MEDINA and HERNANDEZ exchange an unidentified item inside **Hernandez's Nissan**. HERNANDEZ then drove MEDINA back to the **White Impala**, and MEDINA got

back into the backseat of the **White Impala** for less than a minute. MEDINA then exited the **White Impala** and went inside **Subject Premises 5**.

116. Based on my training and experience investigating drug-trafficking offenses and my discussions with other agents experienced in drug-trafficking investigations, I believe that MEDINA obtained controlled substances from HERNANDEZ to distribute to ANDERSON and LUMONT.

117. After the transaction, the **White Impala** pulled off to the east for a few minutes watching traffic. The **White Impala** then headed westbound on Harrison Avenue. The agent who observed this behavior recognized it as a technique commonly used by drug traffickers to identify and evade surveillance by law enforcement.

118. At approximately 1:37 p.m., ANDERSON arrived at the alley located directly behind **Subject Premises 2**. At that time, LUMONT left in the **Gray Buick** and ANDERSON remained at **Subject Premises 2**.

119. At approximately 3:30 p.m., ANDERSON drove to **Subject Premises 6.** Investigating agents observed ANDERSON meeting with an unidentified black male at that residence. ANDERSON and the black male were seen removing items from the trunk of a vehicle.

120. At 3:55 p.m., agents monitoring a video surveillance camera observed ANDERSON arrive back at **Subject Premises 1**, carrying what appeared to be a folded up grocery bag into **Subject Premises 1**.

121. Later, at approximately 5:52 p.m., ANDERSON arrived back near **Subject Premises 2** in the **White Impala**. At approximately 6:05 p.m., ANDERSON

met with CLEVELAND approximately a half block away from **Subject Premises 2**. Surveillance units observed ANDERSON and CLEVELAND conduct a hand-to-hand transaction while ANDERSON remained in the **White Impala**.

122. Earlier in the day, investigating agents intercepted multiple communications between ANDERSON and CLEVELAND, using phone number (779) 774-0039 (hereafter, "**Cleveland's Phone**") indicating that CLEVELAND was attempting to obtain additional narcotics from ANDERSON:[15]

a. At approximately 9:46 a.m., ANDERSON received a call on **Target Phone 1** from **Cleveland's Phone**. The following conversation was intercepted:

| | |
|---|---|
| CLEVELAND: | Man, what the heck you got going on, cuz? |
| ANDERSON: | What's good? |
| CLEVELAND: | Man, I ain't on shit god dammit, shit, trying to see what the heck you got going on. I'm O-U-T. |
| ANDERSON: | My mother fucking ass doesn't know. Just gettin my ass up, I ain't even out yet. |
| CLEVELAND: | I'm probably gunna have to god dammit slide by the crib god dammit I got a few you digs to put out. |

[15] Investigating agents identified CLEVELAND in April 2018, after observing CLEVELAND meet with ANDERSON. Later that day, an agent observed a man wearing the same clothes enter the Winnebago County Adult Probation Office. Agents contacted the deputies working security at the Probation Office to attempt to identify the man based on his clothing. One of the deputies identified the man CLEVELAND, and agents subsequently confirmed the identification after viewing a booking photograph of CLEVELAND. Subscriber records for **Cleveland's Phone** show that it is subscribed to "Clevelen Johnson" at the address for **Subject Premises 3**. In addition, on May 10, 2018, CLEVELAND turned himself in to the Winnebago County Sheriff's Office to resolve an arrest warrant. CLEVELAND provided the phone number for **Cleveland's Phone** to the jail booking officer when he was processed into Winnebago County Jail.

| | |
|---|---|
| ANDERSON: | I'm fitting to get ready to come up in a minute, I'll be over there where I'll get you straight. |
| CLEVELAND: | Yeah because I got a couple, couple dollars to put up too. |
| ANDERSON: | Alright. |
| CLEVELAND: | Alright, just hit me |

(TP1 Session 643) I believe that CLEVELAND was telling ANDERSON that CLEVELAND was almost out of narcotics to sell (stating that he was "O-U-T" but also that he had "a few you digs to put out") and that CLEVELAND had some money to give to ANDERSON either for safe storage or as repayment for narcotics fronted to CLEVELAND ("I got a couple, couple dollars to put up too.").

b. At approximately 2:39 p.m., ANDERSON called **Cleveland's Phone** from **Target Phone 2**. During the call, CLEVELAND stated that he was "all the way O-U-T on both." ANDERSON responded, "Okay. That's what I'm finna get together right now." And CLEVELAND replied, "Alright, well hit me. I'm on the block [the 600 block of North Rockton Avenue]." (TP2 Session 219). I believe that CLEVELAND was saying that he was now completely out of narcotics, and ANDERSON responded that he would put package additional narcotics for CLEVELAND.

c. At approximately 6:03 p.m., ANDERSON received a call on **Target Phone 2** from **Cleveland's Phone**. During the call, ANDERSON asked where CLEVELAND was, and CLEVELAND responded, "Right here on Acorn." ANDERSON told CLEVELAND to "walk around here real quick." (TP2 Session 231) As explained above, about 2 minutes after this last call, agents observed ANDERSON

and CLEVELAND conduct a hand-to-hand exchange near the 600 block of North Rockton. I believe that ANDERSON was providing CLEVELAND with additional narcotics to redistribute to customers.

***June 19, 2018 Transaction Between ANDERSON and MEDINA and HERNANDEZ***

123. On June 18, 2018, investigating agents intercepted multiple calls between **Medina's Phone** and ANDERSON, using **Target Phone 1**. At approximately 12:34 p.m., MEDINA called ANDERSON and advised that MEDINA had "20" or "22". ANDERSON said that he would call MEDINA back later. (TP1 Session 3383) At approximately 4:29 p.m. that day, MEDINA called ANDERSON again asking how long ANDERSON would be so that MEDINA "kn[e]w when to tell [his] mans to drop that off." ANDERSON responded that he would be about 45 minutes. (TP1 Session 3428)

124. At approximately 8:26 p.m., MEDINA contacted ANDERSON again. The following conversation was intercepted by investigating agents during part of that call:

| | |
|---|---|
| ANDERSON: | Where you at with it? |
| MEDINA: | I'm at the crib right now, bro. Fucking, um, my mans, though, he's trying to flood me, man. You know what I'm saying, what's up. I know you can work with that. |
| ANDERSON: | Right. |
| MEDINA: | Man, for the love, bro. |
| ANDERSON: | For the love? |

| | |
|---|---|
| MEDINA: | Yeah, (UI). I'm looking to make some but you gonna definitely—you gonna—you'll be straight. |
| ANDERSON: | Fo' sho. Fo' sho'. |
| MEDINA: | It is what it is, you should be straight, bro. He's holding it for me so, I'm like, man, it's the only one I know, you know what I mean? |
| ANDERSON: | Hell yeah. |
| MEDINA: | That's why I hit you up. |
| ANDERSON: | Man, what you still on? I ain't looked outside. It died down out there, huh? |
| MEDINA: | Ah, yeah, it's dead now. It's over with. Yep, it's straight now. Ain't no telling if it can start back up, though. But he is right down the street from me, bro. But literally, like in between Harrison and, uh, Sandy Hollow so, you know he be in traffic, but he be at the Save-A-Lot too, but whenever I call him and let him know, man, he gonna swoop, you know what I'm sayin', he gonna swoop over and drop it off and let you check it out. |
| ANDERSON: | Okay, okay. Let me get myself back together then. I'm gonna try to come back through there tonight, shit. |
| MEDINA: | Yeah, it'd be worth it, bro. You know what I'm saying? It's about 22, only 2 to 3 G's for it. |
| ANDERSON: | Right. |
| MEDINA: | Yeah. |
| ANDERSON: | Alright, let me get my stuff together. I'm going to come check it out. |

(TP 1 Session 3468) I believe MEDINA was informing ANDERSON that his source, HERNANDEZ, could provide approximately 22 grams of narcotics in exchange for $2,000-$3,000.

125. The call summarized above concluded at approximately 8:29 p.m. Pen register data showed that **Medina's Phone** then called **Hernandez's Phone** at approximately 8:29 p.m. and again at 8:30 p.m. The calls lasted for approximately 51 seconds and 4 seconds, respectively.[16]

126. At approximately 8:37 p.m., ANDERSON, using **Target Phone 1**, called **Medina's Phone**. ANDERSON informed MEDINA that he would meet MEDINA the following morning. (TP1 Session 3470) The call concluded at approximately 8:38 p.m. Pen register data shows that **Medina's Phone** called **Hernandez's Phone** again at 8:38 p.m., and the call lasted approximately 39 seconds.

127. The next day, June 19, 2018, at approximately 9:19 a.m., MEDINA texted **Target Phone 1**, "Gm [good morning] n just hit me up when u ready". (TP1 Session 3484) At approximately 11:00 a.m., ANDERSON, using **Target Phone 1**, called **Medina's Phone**. ANDERSON asked if MEDINA was "at the crib." MEDINA responded, "Yeah." ANDERSON then stated that he would "swing by there" in about 10-15 minutes, which ANDERSON later increased to 20 minutes. MEDINA stated that he was "going to let this fool know right now." After ANDERSON advised that he would be at MEDINA'S crib in about 20 minutes, MEDINA stated that he would

[16] Investigating agents identified **Hernandez's Phone** using a combination of investigative techniques. Among other things, subscriber information for **Hernandez's Phone** lists "Angel Hernandez" as the subscriber, but with an address on 18th Street in Rockford. A search of Facebook also shows that the phone number for **Hernandez's Phone** is linked to a social media account in the name of "Angel Hernandez." In addition, as explained below, **Hernandez's Phone** was located in the bedroom where HERNANDEZ was sleeping when agents executed a search warrant at **Grinnell Apartment 5** on July 2, 2018.

"let [ANDERSON] know if [ANDERSON] need[ed] extra time or not." (TP1 Session 3499)

128. Pen register data shows that **Medina's Phone** then called **Hernandez's Phone** at approximately 11:01 a.m. The call had a duration of approximately 40 seconds.

129. At approximately 11:26 a.m., investigating agents intercepted a call from **Medina's Phone** to ANDERSON on **Target Phone 1**. MEDINA informed ANDERSON that "he" (HERNANDEZ) is "on his way (pause) down the street." MEDINA instructed ANDERSON, "[J]ust come upstairs. We're outside, you know?" (TP1 Session 3504)

130. At approximately 11:50 a.m., investigating agents observed ANDERSON arrive at **Subject Premises 5**. ANDERSON was observed entering **Subject Premises 5**. At approximately 12:16 p.m., investigating agents observed ANDERSON leave **Subject Premises 5**.

131. At approximately 11:50 a.m., investigating agents observed ANDERSON, in **Subject Vehicle 2**, arrive at MEDINA'S apartment located at 4232 Harrison Avenue, Apartment 201, Rockford, Illinois. ANDERSON went inside MEDINA'S apartment. At approximately 12:16 p.m., investigating agents observed ANDERSON leave MEDINA'S apartment and drive out of the area in **Subject Vehicle 2**. Soon after ANDERSON left, a Hispanic male left MEDINA'S apartment, and got into a dark-colored Hyundai Tucson bearing Minnesota registration AGY642.

132. Investigating agents learned that the Hyundai Tucson is a rental car. Information obtained from the rental car company showed that the vehicle had been rented for the period of June 9-19, 2018 to an individual with an address returning to an apartment complex in the 4400 block of Grinnell.

133. Later that day, investigating agents observed ANDERSON meet with various individuals in the Rockford area, including CHRISTOPHER ARNOLD and another individual to whom ANDERSON had been supplying narcotics.

134. At approximately 1:37 p.m., investigating agents intercepted a call from MEDINA to ANDERSON on **Target Phone 1**. During the conversation, ANDERSON informed MEDINA that "it's cool," but "they" said it had a "taste" to it. MEDINA asked ANDERSON if he wanted to "do it and all," to which ANDERSON responded, "Yeah, I'm gonna do it." ANDERSON repeated that he was going to "do it," but asked, "You ain't got it harder than that though?" MEDINA replied, "Yeah that was just like the shape, but the other one, but they're wrapped up. But I ain't trying to touch that right now. You know what I mean? They put up." ANDERSON said that he was going to "spin on [MEDINA]." MEDINA asked how long ANDERSON would be "because that girl was, that girl was hitting him up, he was trying to do some of that, just wait. That way you don't take it out of that." ANDERSON said that he needed "30 minutes." (TP1 Session 3526) I believe that ANDERSON and MEDINA were discussing ANDERSON buying additional narcotics from MEDINA and HERNANDEZ.

135. Pen register data shows that shortly after this call, **Medina's Phone** called **Hernandez's Phone**. The duration of the call was approximately 42 seconds.

136. At approximately 2:29 p.m., ANDERSON contacted MEDINA again. ANDERSON said that he would grab "two" and another "25." ANDERSON said he was going to "pull up" on MEDINA. (TP1 Session 3537)

137. At approximately the same time as the aforementioned calls, investigating agents were conducting surveillance of the apartment complex in the 4400 block of Grinnell Drive. At approximately 2:34 p.m., surveillance units observed two Hispanic males walk out of **Grinnell Apartment No. 5**. Investigating agents identified one of the Hispanic males as HERNANDEZ. HERNANDEZ and the unidentified Hispanic male walked from the apartment to a rental vehicle. HERNANDEZ drove himself and the unidentified Hispanic male directly to **Subject Premises 5**. When Hernandez's and the unidentified Hispanic male pulled into the parking lot outside **Subject Premises 5**, agents observed MEDINA meet with HERNANDEZ and the unidentified Hispanic male in the parking lot. During the meeting, one of the men retrieved a paper bag from Hernandez's vehicle, and the three men then went into **Subject Premises 5**.

138. At approximately 2:45 p.m., ANDERSON, using **Target Phone 2**, called MEDINA and said that he would be at MEDINA'S place in about 7-8 minutes. (TP2 Session 1198)

139. At approximately 3:02 p.m., surveillance units observed ANDERSON arrive at **Subject Premises 5**. Agents observed ANDERSON exit his vehicle and

enter **Subject Premises 5**. Around this same time, investigating agents observed ARNOLD, driving a white Chevrolet Yukon, drive into the parking lot of a fast food restaurant across the street from MEDINA'S apartment complex. Another male got out of the passenger seat of ARNOLD'S vehicle with a drone, and began flying the drone overhead. I believe that ANDERSON, ARNOLD, and the male were using the drone to conduct counter-surveillance of ANDERSON'S meeting with HERNANDEZ and MEDINA either to look for potential police surveillance or to try to follow HERNANDEZ back to HERNANDEZ'S drug inventory.

140. Approximately 9 minutes later, investigating agents observed ANDERSON leave **Subject Premises 5** and drive away in the **Gray Buick**. Around that same time, ANDERSON, using **Target Phone 2**, called (779) 207-1791, which agents previously identified as being used by ARNOLD based on local law enforcement records searches and visual identification of ARNOLD, as described below. During the conversation, ARNOLD asked ANDERSON who was in "that black truck." ANDERSON did not know the answer. ARNOLD asked if ANDERSON wanted them to continue watching the "truck." During the call, ANDERSON stated that "he" (one of the suppliers) was going to "go grab it" after he got off of work at 4:30. ANDERSON added, "I only grabbed that 20 that he just had." ANDERSON also told ARNOLD that ANDERSON had seen who else was calling "his" (one of the supplier's) phones. ANDERSON directed ARNOLD to pull into the car wash. (TP2 Session 1202) Agents subsequently observed ANDERSON, ARNOLD, and the third

male meeting at a nearby car wash. They appeared to be reviewing footage taken by the drone.

141. At approximately 3:15 p.m., investigating agents observed HERNANDEZ and the unidentified Hispanic male leave MEDINA'S apartment, get back into the rental vehicle and drive away. Investigating agents followed the vehicle back to the apartment complex in the 4400 block of Grinnell Drive. Agents observed HERNANDEZ and the unidentified Hispanic male both go inside **Grinnell Apartment 5**. After entering **Grinnell Apartment 5** for approximately one minute, HERNANDEZ left **Grinnell Apartment 5** and went to **Grinnell Apartment 3**.

142. Investigating agents conducted additional surveillance of the apartment complex at 4420 Grinnell Drive on June 19, 2018. During the surveillance, an agent observed HERNANDEZ and the same unidentified Hispanic male referenced above freely enter and exit in and out of **Grinnell Apartment 3** and **Grinnell Apartment 5**. Agents also observed the following: In a span of nearly two hours, approximately 3 unknown individuals met with HERNANDEZ or the unidentified Hispanic male outside either **Grinnell Apartment 3** and **Grinnell Apartment 5**. On each occasion, the individual exited his/her vehicle, and approached one of the **Subject Premises**. As they approached, HERNANDEZ or the unidentified Hispanic male would meet the individual outside for a brief period of time. The individual would then return to his/her vehicle and drive away. The agents who observed these meetings have training and experience investigating drug-trafficking offenses and recognized these meetings as indicative of drug transactions.

***Additional Intercepted Calls and Surveillance on June 20, 2018***

143. On June 20, 2018, investigating agents intercepted multiple calls between ANDERSON and ARNOLD, and MEDINA in which the call participants appeared to be discussing the strength of the controlled substances ANDERSON had obtained from MEDINA and HERNANDEZ.

144. In a call between ANDERSON and ARNOLD, for example, ANDERSON asked, "That shit was good?" ARNOLD responded, "No, that shit's fentanyl." ARNOLD went on to explain that he believed "that mother fucker been mixing it with, that fentanyl," and ANDERSON and ARNOLD then continued to discuss how ARNOLD believed that there was fentanyl in the heroin they had obtained.[17] Based on the context of the conversation, I believe that one or more of ARNOLD'S customers had advised him that they believed there was fentanyl mixed in the heroin because of the strength of the drugs. (TP2 Session 1225)

145. A few minutes later, ANDERSON called another individual to whom ANDERSON had been supplying narcotics and asked, "Did you check on that thing?" The individual responded, "Yeah, two people said that they like it, then god dammit, I just hit another mother fucker right now, told them to call me right back. I meant to call you last night." Later in the conversation, the individual stated, "[T]hat shit strong." ANDERSON asked if the individual's "people" "sniff or they shoot." The individual answered that "it's half and half." (TP2 Session 1226)

---

[17] I believe that they were referring to heroin based on my training and experience, the fact that they believed it was being mixed with fentanyl, and their reference to customers "shooting" it and "sniffing" it.

146. A few minutes later, the individual called ANDERSON back and said that one of his "best" customers said "hell no." The individual said, "She one of my big spenders and she said hell no, 'I don't like that shit.'" (TP2 Session 1227)

147. About one minute later, ANDERSON, using **Target Phone 2**, called **Medina's Phone**. During the call, ANDERSON said, "They gonna have to run that shit back because that shit damn near a dud, them mother fuckers don't even like that all, that shit like some mixed shit, I don't even know what the fuck it is." Later in the conversation, ANDERSON said, "I finna round back up what's left on it and I'mma bring that shit back cuz that shit ain't, that shit ain't going nowhere." MEDINA responded, "Oh damn, alright, I'mma give him a call." MEDINA repeated later in the conversation, "I'mma call him right now." (TP2 Session 1228)

148. Pen register data shows that, about one minute later, **Medina's Phone** called **Hernandez's Phone**. **Medina's Phone** exchanged three calls with **Hernandez's Phone** between 9:29 a.m. and 9:37 a.m. The calls lasted approximately 46 seconds, 36 seconds, and 3 minutes 27 seconds, respectively.

149. During that same timeframe, ANDERSON exchanged additional calls with ARNOLD and another individual to whom ANDERSON was supplying narcotics in which ANDERSON talked about rounding up the remaining heroin so that it could be returned. (TP2 Sessions 1229, 1230) In ANDERSON'S call with one of those individuals, ANDERSON referred to "grab[bing] this cheese back," which I believe was a reference to ANDERSON demanding his money back from the suppliers.

150. At approximately 9:49 a.m., ANDERSON called MEDINA again. During the call, MEDINA stated that he "just got done talking to him, man, on the phone. He said, 'Man, what the fuck?' He said (unintelligible). He's like, 'Did you sell it to him.' He's like, 'Did you sell it to him?' He said there's really nothing to it." ANDERSON stated later in the call, "That shit, that shit, that shit ain't that though or I wouldn't even be calling back. I'd be calling for some more." MEDINA referred to how "he" (HERNANDEZ) was "out of town," and ANDERSON and MEDINA discussed how to get ANDERSON'S money back in the meantime. MEDINA stated that he believed "he" (HERNANDEZ) "want[ed] to talk about it, like maybe, I don't know maybe like open up another one of the other, one of the other things, you know what I mean, and see, you know what I mean? But I don't know." ANDERSON reiterated that he wanted "that cheese back." During the call, MEDINA stated multiple times that "he" (HERNANDEZ) was out of town and was going to call MEDINA when he got back to town. (TP2 Session 1232)

151. I believe that ANDERSON was saying that he wanted to get the money he paid for the heroin back from HERNANDEZ, and MEDINA was indicating that HERNANDEZ wanted to talk to ANDERSON about the narcotics before deciding whether to give ANDERSON his money back. I believe MEDINA was also raising that possibility that HERNANDEZ potentially would want to replace the bad heroin with new narcotics ("open up another one of the other, one of the other things"), rather than give ANDERSON his money back.

152. Pen register data shows that **Medina's Phone** called **Hernandez's Phone** about 10 minutes later. The call had a duration of approximately 15 seconds. The next contact between **Medina's Phone** and **Hernandez's Phone** was on June 25, 2018 at approximately 3:55 p.m., when **Hernandez's Phone** called **Medina's Phone**. According to the pen register data, the call was not answered. The pen register also shows an unanswered call from **Hernandez's Phone** to **Medina's Phone** at approximately 8:27 p.m. on June 26, 2018.

153. Investigating agents conducted periodic surveillance of the apartment complex at 4420 Grinnell Drive on June 20, 2018. During the surveillance, agents observed HERNANDEZ and the same unidentified Hispanic male described above meet with individuals for approximately 2-5 minutes in the parking lot of 4420 Grinnell Drive.[18] Investigating agents observed approximately 6 of these meetings conducted by HERNANDEZ or the unidentified Hispanic male. The agent who observed these brief meetings has been investigating drug-trafficking crimes for several years and recognized these meetings as indicative of drug transactions.

***July 2, 2018 Search Warrant Executions at Grinnell Apartment 5***

154. On the morning of July 2, 2018, investigating agents executed search warrants at **Grinnell Apartment 3** and **Grinnell Apartment 5**. Investigating agents found HERNANDEZ sleeping in the bedroom of **Grinnell Apartment 5**, which is a one bedroom apartment. Another male, later identified as S.D., was also

---

[18] Agents recognized the unidentified Hispanic male as the same male from surveillance the day before based on the male's physical characteristics and location.

present in **Grinnell Apartment 5** when the search warrant was executed. S.D. later told investigating agents that he is a cousin of HERNANDEZ who was staying with HERNANDEZ temporarily.[19] In a hall closet in **Grinnell Apartment 5**, investigating agents found over 4 kilograms or "bricks" of a substance that field tested positive for the probable presence of heroin.[20]

155. Investigating agents also located **Hernandez's Phone** in the bedroom where HERNANDEZ was found sleeping. A search of **Hernandez's Phone** revealed a Facebook messenger conversation between HERNANDEZ and MEDINA in which HERNANDEZ and MEDINA discussed drug-trafficking activities:

a. On June 6, 2018, HERNANDEZ asked, "What good my Nigga cause I'm trying to get a lil sleep in?" MEDINA responded, "Shit this nigga wanted that other N me shit I just spent 500 n my last 20 in gas on the Lac plates alternator etc. If u will shit do my a dirty dub til manana. I got appointments [potentially tattooing appointments] lined up." HERNANDEZ then told MEDINA that he cannot "front" anything.

b. On June 8, 2018, HERNANDEZ sent a message to MEDINA that stated, "Well I'm still holding if U. know anyone lookin." MEDINA responded, "Ight."

c. On June 12, 2018, at approximately 12:53 a.m., HERNANDEZ initiated a conversation with MEDINA. During that discussion, HERNANDEZ

---

[19] S.D. did not match the physical description of the unidentified Hispanic male with whom agents had previously seen HERNANDEZ conducting drug-trafficking activities.

[20] The substances seized from **Grinnell Apartment 5** have been submitted to a lab for drug testing. The lab results have not yet been received.

informed MEDINA that "the chick crystal" would be "around" the following afternoon. HERNANDEZ added, "That other white chick around to." MEDINA replied that he would let HERNANDEZ know and that "he" would probably want to see "her." Based on my training and experience, as well as the training and experience of other investigating agents, I believe HERNANDEZ was explaining that he was going to being obtaining narcotics that he would be looking to sell. MEDINA responded that he would talk to an unidentified male who may be interested.

d. On June 15, 2018, at approximately 1:23 a.m., MEDINA told HERNANDEZ that someone "left 20 for a dub." HERNANDEZ stated, "I got u with a dub" and he would "b there few minutes." MEDINA replied that he would "b out there." At approximately 2:26 a.m., MEDINA messaged HERNANDEZ and told him that he left his "blk rag" in his car. Shortly after that message, MEDINA stated, "Ima fuck with u tho from now on…Its constant." HERNANDEZ replied, "All good got you."

e. On June 18, 2018, MEDINA and HERNANDEZ exchanged several messages regarding the potential deal with ANDERSON. On June 19, 2018, MEDINA and HERNANDEZ again exchanged several messages during the morning about a potential deal with ANDERSON. At one point, MEDINA informed HERNANDEZ that ANDERSON would be there soon. MEDINA added, "I told him to come up I aint trying to b out front."

f. On June 22, 2018, at approximately 10:04 p.m., MEDINA asked HERNANDEZ if he was "good on that lil white bitch." HERNANDEZ asked, "How much," to which MEDINA responded, "40." Later in the conversation MEDINA

informed HERNANDEZ that it was for his neighbor. I believe MEDINA was trying to obtain narcotics from HERNANDEZ to sell to MEDINA'S neighbor at **Subject Premises 5**.

### E. ANDERSON'S June 6, 2018 Transaction with Supplier A Accompanied by ARNOLD

156. On June 6, 2018 at approximately 9:13 a.m., investigating agents intercepted a call to ANDERSON, using **Target Phone 1**, to a male subject using a phone number ending in -3763. The following conversation was intercepted during the call:

| | |
|---|---|
| ANDERSON: | Yo? |
| MALE: | Yo, yo, yo. Uh, he finna put everything together and shit. I told him to just, uh, get everything together and tell me when you taking off and I could tell you so you, uh, closer than he is. He coming from the city, so. |
| ANDERSON: | Aight |
| MALE: | So hit me when, uh, you getting ready to take off. Be ready, you know what I'm saying. So (unintelligible) sometime and shit. |
| ANDERSON: | Alright, just hit me and let me know what's up. |
| MALE: | Yeah, yep. But it's for sure though. |

(TP1, Session 1958) I believe that the male on the other end of the call was informing ANDERSON that a supplier with whom the male was in contact (hereafter, "**Supplier A**") would be putting together narcotics to sell to ANDERSON later that day.

157. At approximately 9:14 a.m., ANDERSON, using **Target Phone 1**, called **Arnold's Phone**. During the conversation, ANDERSON informed ARNOLD that ANDERSON had "one lined up" for them "raw," but they would have to go get it. I believe that ANDERSON and ARNOLD were talking about getting narcotics from **Supplier A**. (TP1 Session 1960)

158. Shortly thereafter, ANDERSON exchanged several calls with the male using phone number -3763 regarding where ANDERSON would meet with **Supplier A**. Eventually, ANDERSON suggested a location in Elgin, Illinois. The male subsequently called back and told ANDERSON that **Supplier A** agreed. The male informed ANDERSON that the price would be "92," or "23 a trey." (TP1 Sessions 1974, 1977, and 1980) Based on my training and experience and discussions with agents with experience investigating drug-trafficking offenses, I believe that the male was stating that **Supplier A** would sell ANDERSON four ounces of narcotics for a total of $9,200 ($2,300 per ounce).

159. At approximately 12:11 p.m., investigating agents conducting surveillance observed ANDERSON leave **Subject Premises 1** in ANDERSON'S **Black GMC**. ANDERSON placed a call to **Arnold's Phone**, and ANDERSON and ARNOLD agreed to meet at a carwash on State Street in Rockford, Illinois. After ANDERSON arrived, ANDERSON called ARNOLD again, and ARNOLD advised that he was at the tobacco store. (TP2 Sessions 591, 593, 594, and 597) A surveillance team then observed ANDERSON meet with ARNOLD near a tobacco store off of State Street. Investigating agents observed ARNOLD get into the passenger seat of the

**Black GMC**. An investigating agent identified ARNOLD based on the agent's review of a police booking photograph of ARNOLD.

160. ANDERSON then began to drive the **Black GMC** erratically in a manner which investigating agents recognized based on their training and experience as designed to elude surveillance by law enforcement. Around 1:00 p.m., ANDERSON got onto Interstate 90 and began driving toward Elgin. Surveillance units followed the **Black GMC** out to Elgin. Investigating agents intercepted multiple calls between ANDERSON and the male using phone number -3763 discussing ANDERSON'S whereabouts and estimated arrival time while ANDERSON was en route to Elgin. (TP2 Sessions 598, 600, 601, 602, and 603)

161. At approximately 1:51 p.m., the **Black GMC** arrived in a parking lot of a shopping area in Elgin, Illinois. Investigating agents conducting surveillance observed ANDERSON exit the **Black GMC** and get into a white SUV. ANDERSON remained in the white SUV for approximately two to three minutes, and then returned to the **Black GMC**. The **Black GMC** then departed the area. Surveillance units observed the driver of the white SUV (**Supplier A**) drive the vehicle into a nearby parking lot. An investigating agent observed that **Supplier A** appeared to be counting money in the vehicle.

162. Surveillance units followed the **Black GMC** back to Rockford after the meeting between ANDERSON and **Supplier A**. The **Black GMC** made a brief stop at a fast food restaurant, and then traveled back to **Subject Premises 1**, arriving at

approximately 2:58 p.m. Agents conducting surveillance observed ANDERSON and ARNOLD exit the **Black GMC** and go inside **Subject Premises 1**.

163. Shortly after ANDERSON left the meeting with **Supplier A**, while ANDERSON was en route back to Rockford, ANDERSON called the male using phone number -3763 and expressed gratitude for the male referring him to **Supplier A**. (TP2 Session 606)

164. At approximately 3:04 p.m., the male sent a text to ANDERSON stating, "Light a duce." (TP2 Session 609) ANDERSON called the male back explaining that ANDERSON thought it was "9." The male responded, "Yeah, it was supposed to be 92." (TP2 Session 610) I believe that the male was relaying that ANDERSON had "shorted" **Supplier A** $200 for the narcotics ANDERSON had just purchased.

165. Immediately following that call, ANDERSON called a phone number believed to be used by **Supplier A**, apologized for having shorted him, and indicated that he would pay **Supplier A** back at a later time. (TP3 Session 611)

166. Based on the intercepted communications, I believe that the June 6, 2018 transaction was ANDERSON'S first transaction with **Supplier A**. I know from my training and experience and discussions with other agents with experience investigating drug-trafficking offenses that drug traffickers commonly bring one or more members of their drug-trafficking organization with them to meetings with new suppliers in order to protect themselves from being robbed or injured by the supplier and to assist with looking out for potential police surveillance. I believe that ARNOLD

accompanied ANDERSON to the transaction with **Supplier A** for ANDERSON'S protection.

167. Subsequent intercepted communications between ANDERSON and **Supplier A** showed that ANDERSON also brought a firearm with him to the meeting with **Supplier A**. On June 13, 2018, agents intercepted a call between ANDERSON, using **Target Phone 2**, and **Supplier A**. ANDERSON and **Supplier A** discussed meeting up again. During the call, **Supplier A** said, "You ain't gotta bring no poles. We got all that shit this way, bro." I recognize "pole" as a common slang term used for firearms. ANDERSON responded, "Right, yeah. I got my shit, my shit legit." ANDERSON then explained that, after his murder conviction was overturned, he did not "have no record" so he "went and signed up for everything [he] needed to sign up for." I believe ANDERSON was saying that he had applied for a FOID card and a concealed carry license. Later in the conversation, **Supplier A** said, "I ain't know what you had. I just seen the handle on that mother fucker. It's like a little Taurus or something, Smith & Wesson?" ANDERSON responded, "Nah, that's a Ruger." I recognize "Ruger" as the name of a firearms manufacturer. Based on the context of this call, I believe ANDERSON and **Supplier A** were discussing that ANDERSON had been carrying a Ruger firearm during ANDERSON'S and **Supplier A's** drug transaction on June 6, 2018. (TP2 Session 905)

168. After ANDERSON'S transaction with **Supplier A** on June 6, 2018, investigating agents intercepted multiple calls in which ANDERSON directed

individuals to go to the alley behind **Subject Premises 2** where ANDERSON regularly conducts drug transactions.

### F. Additional Information Regarding JUSTIN HILL

169. On June 15, 2018, a Winnebago County Sheriff's Police deputy conducted a traffic stop of ANDERSON'S **Black GMC** after the driver committed a traffic violation. During the traffic stop, the deputy identified the driver of the **Black GMC** as JUSTIN HILL based in part on the identification HILL provided to the deputy.

170. Shortly after the traffic stop, HILL, using telephone number (815) 601-4732 ("**Hill's Phone 1**"), called ANDERSON on **Target Phone 1** and said that he had just been pulled over by the "Sheriff" coming out of the alley. HILL told ANDERSON "to leave that bitch alone for the night, you hear me?" I believe HILL was telling ANDERSON not to be dealing narcotics out of the alley that night because of police surveillance. During the call, HILL also referenced how he told the police officers how he "just got in a car accident." HILL stated that he "was gonna park that bitch [the **Black GMC**] in the garage." ANDERSON responded that "mother fuckers had been OD'ing" so "they [the police] were just trying to crack down."[21] (TP1 Session 3083)

171. About 45 minutes before this call, investigating agents intercepted a call from (779) 537-4690 to ANDERSON on **Target Phone 1** in which the user of the

[21] HILL also referenced that the police knew he was on parole. I know from my review of court records that HILL currently is on federal supervised release.

(779) 537-4690 phone number, identified as HILL based on the context of calls from that number, discussed the damage to the **Black GMC** resulting from a car accident.[22] (TP1 Session 3079) And then approximately 15 minutes after the conversation in which HILL described being pulled over by police, **Target Phone 1** received another call from (779) 537-4690 (hereafter, "**Hill's Phone 2**"), in which HILL and ANDERSON continued to talk about police pulling over HILL.[23] In addition, in a call intercepted on May 30, 2018 between ANDERSON on **Target Phone 1** and HILL, using **Hill's Phone 2**, the participants in the call referred to the user of **Hill's Phone 2** as "Justin."

172. As explained below, the investigation has shown that, at times, ANDERSON obtained narcotics from HILL to resell to others, and at other times, HILL obtained narcotics from ANDERSON to resell to others. The investigation also showed that ANDERSON was mentoring HILL on how to run a successful drug-trafficking organization.

173. On the morning of May 25, 2018, for example, HILL, using **Hill's Phone 1** contacted ANDERSON on **Target Phone 2**. During the call, HILL stated, "Man, I need you man." ANDERSON responded, "Come get this little shit man." But HILL explained, "I ain't talking about that, ok that, and I might need something else." Later in the conversation, HILL stated that he "need[ed] to borrow some money." HILL

---

[22] HILL again referenced the fact that he is on parole during the call.

[23] Prior to June 15, 2018, investigating agents believed that the user of **Hill's Phones 1-2** was D. Hill. After the June 15, 2018 traffic stop, agents determined that the correct user of those phones was JUSTIN HILL.

stated, "That's what I'm asking you. Act like I went to jail and come bond me out cause I ain't talking about nothing but a couple hundred." During the conversation, ANDERSON repeatedly told HILL, "You're doing this shit wrong," and ANDERSON explained that "You got to stack the shit, you got to stack the shit, B, you got to stack it up." HILL responded, "I know, but if I can't move around, how the fuck am I—you know what I'm saying?" (TP2 Session 64) Based on the context of the call and my training and experience, I believe that HILL was asking to borrow money from ANDERSON in order to buy a new vehicle, and ANDERSON was telling HILL that he needed to be saving his money ("stack it up") not spending it all.

174. Later that day, HILL, using **Hill's Phone 1** contacted ANDERSON again on **Target Phone 2**. During the call, ANDERSON asked, "What you lookin' like on the other side?" After clarifying, HILL stated, "We're slow though, that's the thing. If it ain't for you, shit." ANDERSON informed HILL, "I'm calling for me." After additional back-and-forth about ANDERSON'S and HILL's location, HILL stated, "Let me know, uh, I ain't got nothin' but a few, but I got a few. You hear me?" ANDERSON replied, "All I need is a couple." After a brief pause, ANDERSON told HILL that he can "go a different direction" if HILL does not want to "get rid of that little shit." Shortly after that, HILL told ANDERSON that he had "an eighth" for him. Before the call ended, ANDERSON told HILL that he is talking about "Christina Aguilera." HILL replied, "Just link up with me." (TP2 Session 88) Based on my training and experience, as well as my discussions with other agents who have experience investigating drug-trafficking offenses, I believe ANDERSON was asking

HILL for cocaine ("Christina Aguilera") and arranging to meet with HILL at a later date.

175. At approximately 6:50 p.m., ANDERSON received a call from **Hill's Phone 1** on **Target Phone 2**. HILL told ANDERSON that his "girl" just got there. ANDERSON said he would be at **Subject Premises 1** in 10 minutes. (TP2 Session 114) At approximately 7:00 p.m., a gold Buick with Illinois registration N804668 arrived at **Subject Premises 1**. A black male who was not identified at that time exited the vehicle and entered **Subject Premises 1**. A short time later, the Buick was observed leaving the area. Based on the context and timing of the call, I believe HILL was the unidentified black male driving the gold Buick. Investigating agents also saw HILL driving the gold Buick on later dates.

176. On May 27, 2018, at approximately 3:55 p.m., HILL on **Hill's Phone 1** called ANDERSON on **Target Phone 2**. The following conversation was intercepted, in which ANDERSON talked about trying to help HILL sell remaining narcotics that HILL had and "build [HILL'S] stock up":

| | |
|---|---|
| ANDERSON: | I'm trying to get that other thang. I'm on E. What we gonna do, B? |
| HILL: | (U/I) |
| ANDERSON: | You said you had another one, didn't you? |
| HILL: | Nah. |
| ANDERSON: | Oh, that was it? |
| HILL: | Yeah. I woulda gave it to you. You know that. |
| ANDERSON: | Well, what we gonna—what we gonna do then? |

| | |
|---|---|
| HILL: | (U/I) |
| ANDERSON: | Huh? |
| HILL: | (U/I) What you tryna do? |
| ANDERSON: | Shit, I'm trying to get busy. I gotta feed all these kids. I gotta, I gotta stay busy. |

(TP2 Session 168)

177. Later in the call, ANDERSON said, "I'm saying, I'm trying to help you build your stock up, B. (U/I) What we gonna do?" HILL responded, "I know. That's why I'm finna—so I'm gonna tell you this. I got about 10 of those things left, all (U/I)—all the original way, you hear me? The original amount." Later in the call, HILL stated that he was trying to "give it so that you (ANDERSON) could see some too." ANDERSON responded that he just needed a "fin though," and HILL replied, "I ain't got it bro." HILL then stated, "Nobody. I can't even call a mother fucker for you." ANDERSON asked, "So what, he just gone?" And HILL responded, "Yep." Toward the end of the call, HILL stated, "They don't want to take what I got," and explained that he needed ANDERSON to "help [him] god dammit at least make that disappear if you can." ANDERSON responded, "Yeah, we gonna, we gonna, we gonna get good." (TP2 Session 168) Based on my training and experience and the context of the call, I believe that HILL had some additional narcotics that he was having trouble selling, and ANDERSON agreed to try to help HILL sell them.

178. On May 28, 2018, at approximately 2:38 p.m., ANDERSON, using **Target Phone 2**, called HILL on **Hill's Phone 1** and asked if HILL had "that bizz line ready?" HILL said that he did and could "go grab it." ANDERSON told him to

"grab it" because "mother fucker gonna bring us a dizzo real quick." HILL responded that he was about to meet somebody at his crib, and ANDERSON then asked, "Man, you want this shit or not?" HILL responded, "Yeah, I'm sayin' go grab it for me and I got it, it's at home." ANDERSON replied, "I'm saying, I'm gonna need the band." HILL asked if he needed to bring it to ANDERSON, and ANDERSON responded, "Nah. I'm on my way over there." (TP2 Session 218) This conversation took place on the same day that ANDERSON was supplied narcotics by MEDINA and HERNANDEZ (TP2 Session 218). I believe that ANDERSON was saying that ANDERSON had found narcotics, and ANDERSON was asking if HILL wanted to buy some. HILL said yes, and ANDERSON explained that he needed money from HILL then ("the band").

179. At approximately 2:52 p.m., ANDERSON received a call from **Hill's Phone 1**. During the call, HILL stated, "I need to borrow an eighth before I run all the way to the joint. Is that possible?" ANDERSON responded, "You say what?" And HILL replied, "I need to borrow a G, before I run to the joint. Grab it real quick." ANDERSON acknowledged HILL'S request and stated that he was "at the crib." (TP2 Session 340) Approximately 20 minutes later, HILL called ANDERSON and asked, "You have that ready for me, bro?" HILL stated that he was "gonna pull up," and ANDERSON told HILL to "come in." (TP2 Session 345) I believe that HILL was asking if he could "borrow" narcotics from ANDERSON.

180. At approximately 5:07 p.m., ANDERSON received a call from **Hill's Phone 1** on **Target Phone 2**. Upon answering, HILL informed ANDERSON that

they "were on." ANDERSON confirmed and stated that he would "come by there." HILL informed ANDERSON that it would "be an eighth." After some back-and-forth, HILL told ANDERSON to give him about an hour. (TP2 Session 357)

181. During that same conversation, ANDERSON told HILL, "[D]on't, don't, don't, don't sell nobody none of that fentanyl. You ain't got to, you hear?" HILL responded, "I understand, but I already have some lined up. But I mean." ANDERSON continued to try to convince HILL not to sell fentanyl. HILL responded that "my main [customer] don't want (U/I)," to which ANDERSON responded, "Fuck what they want. . . . ." ANDERSON said, "I drop it down, I drop it down so it be a little hotter for them, a little stronger for them." I believe that ANDERSON was advising HILL that he should not distribute fentanyl, even if customers want it, because fentanyl is dangerous. I believe that ANDERSON was advising HILL that he should make the heroin he was distributing more pure so that it would be stronger, instead of resorting to distributing fentanyl. (TP2 Session 357)

182. At approximately 8:05 p.m., ANDERSON received a call from HILL. HILL informed ANDERSON that he was going to leave his current location. ANDERSON told HILL, "Here I come right now." (TP 2 Session 361)

183. At approximately 8:29 p.m., ANDERSON placed a call to HILL. ANDERSON asked HILL if he was "out there." HILL replied, "Yep." ANDERSON then stated, "Here I come." (TP2 Session 362) At approximately the same time, ANDERSON, in the **Black GMC**, was observed pulling into the driveway of **Subject Premises 6**. ANDERSON was then observed walking into the unattached garage

through the south service door of **Subject Premises 6**. ANDERSON and another black male, later identified as HILL, walked out the same south service door of the garage approximately five minutes after going in. Both men stood by ANDERSON'S vehicle as they spoke. After approximately five minutes, ANDERSON then got into the vehicle and left the area.

184. On June 1, 2018, at approximately 7:04 a.m., HILL, using **Hill's Phone 1**, called ANDERSON on **Target Phone 2** and talked ANDERSON about how some of his garbage bags were missing. HILL opened the conversation by asking, "Can I ask you a question? You remember you told me the garbage right?" ANDERSON responded, "Uh huh." HILL later said, "There wasn't nothing in there, I know for sure, but what I'm trying to tell you is that they gone, you hear me?" Later in the conversation, HILL asked, "What they do? They come grab and then go through it?" ANDERSON responded, "Uh huh." (TP2 Session 383) I believe that HILL and ANDERSON were discussing trash searches that can be conducted by law enforcement. Based on the context of the conversation, I believe that ANDERSON previously had warned HILL that law enforcement officers sometimes search through trash for evidence of drug trafficking. I believe that HILL was telling ANDERSON that HILL believed that is what happened to HILL.

185. On June 5, 2018, at approximately 12:40 p.m., HILL, using **Hill's Phone 1**, contacted ANDERSON on **Target Phone 2**. ANDERSON informed HILL that he was trying "to get the other thing together." HILL then asked, "Not Christina?" ANDERSON replied, "Yes." During the conversation, ANDERSON later

informed HILL that he only "needs about two of them." HILL then told ANDERSON that he would "say something to him." (TP2 Session 563) After consulting with other investigating agents, I believe ANDERSON was informing HILL that he would like to get cocaine, and HILL'S response meant that HILL would contact his source of supply.

186. At approximately 1:49 p.m., HILL contacted ANDERSON on **Target Phone 2**. HILL informed ANDERSON that he had "about three soft and three hard." After some back-and-forth, ANDERSON agreed to take it. HILL informed ANDERSON that he had to come that direction on his way to something else. (TP2 Session 567) Based on my training and experience, as well as the training and experience of other investigating agents, I believe HILL was informing ANDERSON that he had both crack cocaine and powder cocaine available for ANDERSON.

187. At approximately 1:57 p.m., surveillance units in the area of **Subject Premises 6** observed HILL leave **Subject Premises 6** in a light blue Chrysler Town and Country minivan with Illinois registration 551113. At approximately 2:07 p.m., HILL arrived at **Subject Premises 1** and was subsequently observed entering the residence. At approximately 2:09 p.m., investigating agents observed HILL at **Subject Premises 1**. Based on my training and experience, as well as the context of the calls, I believe HILL was delivering narcotics to ANDERSON at **Subject Premises 1**.

188. On June 8, 2018, ANDERSON called HILL on **Hill's Phone 1**. During the call, HILL stated, "I need you though." ANDERSON responded, "I finna come

through," and HILL replied, "Well I always need you so that ain't nothing new." (TP2 Session 704) I believe that HILL was trying to obtain narcotics from ANDERSON, and ANDERSON was stating that he would meet with HILL to provide HILL with narcotics.

### G. Additional Information Regarding CLEVELAND

189. The investigation has shown that ANDERSON regularly provides narcotics to CLEVELAND which CLEVELAND, in turn, distributes to customers. Over the course of the investigation, investigating agents intercepted several calls in which CLEVELAND advised ANDERSON that CLEVELAND was "O-U-T" or "near O-U-T," and ANDERSON and CLEVELAND then made plans to meet up later that day. Those calls are summarized below:[24]

a. On May 24, 2018, at approximately 3:58 p.m., JOHNSON called **Target Phone 1** and said that he was "near O-U-T" Later in the call, JOHNSON clarified that he was not "all the way O-U-T, but—I'm almost." (TP1 Session 192) Later that day, at approximately 7:16 p.m., JOHNSON called **Target Phone 1** and said, "Now I'm all the way O-U-T." ANDERSON responded that he was "finna come over there right now then." (TP1 Session 205)

b. On May 28, 2018, at approximately 9:46 a.m., JOHNSON called **Target Phone 1** and stated, "Man, I ain't on shit, god dammit, shit, trying to see what the heck you got going on, I'm O-U-T." During that call, JOHNSON also stated that he had a "couple dollars to put up." (TP1 Session 543) Later that day, JOHNSON

---

[24] JOHNSON was using **Johnson's Phone** during all of the calls summarized below.

received a call from **Target Phone 2**. During the call, JOHNSON stated that he was "all the way O-U-T on both." (TP2 Session 219)

c. On May 30, 2018, at approximately 7:27 p.m., JOHNSON received a call from **Target Phone 2**. During the call, JOHNSON stated, "Man, shit, I'm O-U-T, playa." ANDERSON and JOHNSON then discussed meeting later that day. (TP2 Session 329)

d. On June 2, 2018, at approximately 6:22 p.m., JOHNSON received a call from **Target Phone 1**. During the call, JOHNSON told ANDERSON, "I'm probably going to need some of that other, that other god dammit. I'm waiting on my other calls though." (TP1 Session 1656)

e. On June 3, 2018, at approximately 11:05 a.m., JOHNSON called **Target Phone 2** and told ANDERSON, "I need to bump into—I need some of the other side." (TP2 Session 483)

f. On June 8, 2018, JOHNSON received a call from **Target Phone 2** and told ANDERSON, "I'm done there god dammit, O-U-T on my line." ANDERSON responded that he would "be over there in like 20 minutes." (TP2 Session 705)

g. On June 12, 2018, JOHNSON called **Target Phone 2** and told ANDERSON, "I ain't all the way O-U-T, I just don't wanna run out." ANDERSON responded, "No, I got you (U/I)." JOHNSON then told ANDERSON to hit him up once ANDERSON "g[o]t back this way." (TP2 Session 874)

h. On June 18, 2018, at approximately 4:35 p.m., JOHNSON called **Target Phone 2** and advised that he was "O-U-T." ANDERSON responded that he

would "bend" on someone after he was done eating and then call JOHNSON back. During that same call, JOHNSON also stated that he wanted to "put a couple dollars up." (TP2 Session 1160)

190. In addition, the investigation showed that, on May 29, 2018, ANDERSON and JOHNSON discussed pooling resources for a potential future transaction. During the call, ANDERSON stated, "If the ticket decent enough, I'm going to drop your fin, you hear me? with my shit." Later in the call ANDERSON said "mother fuckers out here scrambling but I got some access I'm just trying to see what he talking about" then "It's going to be in the best interest trust me, you already know that." JOHNSON responded with "hell yeah." ANDERSON said, "I usually would of did it with somebody else but shit you goddammit you in position now shit that I can do it with you. I don't got to fuck with nobody else" and then, "better be putting up a mother fucking fizzee, getting back down there, getting a 20 back down there. 15-20." JOHNSON replied with "uh hell yeah, if I can get a 20 back, I'm good. 15 I'm good, it don't make no difference" JOHNSON confirmed with, "uh well shit, hell, at 15 or 20, goddammit hell, I'm like well man. If it's a 20 cuz, go for it." Based on my training and experience, the context of the conversation, and my knowledge of this investigation, I believe ANDERSON was saying that, if a supplier had a good enough price, ANDERSON would combine CLEVELAND'S money with ANDERSON'S own money in a combined purchase. (TP2 Session 269)

191. The investigation also has shown that ANDERSON and CLEVELAND warn each other about potential police surveillance in the area of North Rockton

Avenue. As explained above, on May 25, 2018, ANDERSON called JOHNSON to warn JOHNSON about a potential police surveillance vehicle and JOHNSON responded that he would "put mother fuckers on their toes," which I recognize as meaning that JOHNSON would alert their other associates to the potential surveillance. (TP2 Session 111) (*See* paragraph 77 above.) In addition, on June 18, 2018, JOHNSON advised ANDERSON of a police detective car parked on Winnebago Street. JOHNSON said that he was "watching his ass" and was going to go home and stay in for the night. (TP2 Session 1164)

192. In addition, the investigation also has shown that ANDERSON has put narcotics on "standby" for CLEVELAND. On June 11, 2018, at approximately 4:47 p.m., JOHNSON called ANDERSON on **Target Phone 2**. During the call, CLEVELAND asked ANDERSON to "put some of that on standby playa," and ANDERSON responded, "I got you." JOHNSON then clarified, "On the D side, not on the other side, on the usual side." ANDERSON again stated, "I got you. Whenever you ready." JOHNSON stated that "mother fuckers been eatin me up," and ANDERSON responded, "I already know. That shit a hit too, ain't it?" The call concluded by JOHNSON reiterating, "I ain't ready right now. I just need something on standby," and ANDERSON again responding, "I got you." (TP2 Session 822) Based on my training and experience and the context of the conversation, I believe that JOHNSON and ANDERSON were talking about how their current supply of heroin ("D") was a hit with their customers, and CLEVELAND wanted ANDERSON to set

some heroin to the side ("on standby") for CLEVELAND so that it would be available when CLEVELAND ran out of his supply of heroin.

193. On multiple occasions during this investigation, agents have observed CLEVELAND meet with unidentified individuals for short periods of time during which hand-to-hand exchanges were made. Agents recognized this type of activity as indicative of narcotics transactions based on their training and experience investigating drug-trafficking offenses.

### I. Additional Information Regarding LUMONT

194. As explained above, LUMONT went with ANDERSON to the March 28, 2018 transaction with MEDINA and was in the vehicle with ANDERSON and MEDINA when the transaction occurred. As explained above, I know that drug traffickers commonly bring one or more members of the drug-trafficking organization with them when they are meeting with suppliers in part to provide protection and in part to assist with spotting police surveillance. I believe LUMONT was serving this role by accompanying ANDERSON to the transaction with MEDINA. The investigation has shown that ANDERSON also is providing narcotics to LUMONT, and that LUMONT went with ANDERSON to conduct at least one other narcotics transaction.

195. On May 25, 2018, at approximately 3:33 p.m., for example, LUMONT, using phone number (312) 307-5619 (hereafter, "**Lumont's Phone**"), sent a text message to **Target Phone 1** that read, "Zip done." I recognize the term "zip" as a

slang term commonly used to refer to an ounce of a controlled substance.[25] (TP1 Session 307) Immediately thereafter, LUMONT called ANDERSON on **Target Phone 1** and referenced the text message he had just sent. ANDERSON responded that he had not seen it yet but was getting ready to look at it. LUMONT replied, "Yep, let me know. Call me right back." (TP1 Session 309). ANDERSON and LUMONT had a brief call about 10 minutes later. (TP1 Session 311).

196. At approximately 6:56 p.m., LUMONT texted "Yo" to **Target Phone 1** (TP1 Session 327) LUMONT then called **Target Phone 1** about a couple minutes later. During the call, ANDERSON stated, "I'm getting ready to pull up to my crib. I'm finna meet J Boo now, get the shit together. Come spin on me." (TP1 Session 329) Investigating agents later identified "J Boo" as a nickname for HILL based on a combination of intercepted communications in which "J Boo" was referenced and surveillance of HILL taking actions consistent with "J Boo."[26]

197. As explained in paragraph 175 above, investigating agents observed a black male—who was not identified at the time but is now believed to be HILL based on intercepted communications and subsequent surveillance of HILL driving the same type of vehicle—arrive at **Subject Premises 1** at approximately 7:00 p.m. Investigating agents conducting video surveillance observed LUMONT later pull up

---

[25] Investigating agents identified LUMONT as the user of **Lumont's Phone** based on subscriber records, which show that **Lumont's Phone** is subscribed to LUMONT, and on surveillance

[26] In an intercepted call on May 28, 2018, for example, LUMONT asked ANDERSON, "Where you finna go?" ANDERSON said, "Justin's crib." LUMONT asked, "Huh?" And ANDERSON then responded, "By J Boo's shit." (TP1 Session 886).

to **Subject Premises 1** at approximately 7:45 p.m. Based on the intercepted calls and surveillance, I believe that ANDERSON obtained narcotics from HILL and then provided an ounce ("zip") of the narcotics to LUMONT.

198. About 45 minutes later, agents conducting video surveillance observed LUMONT and ANDERSON exit **Subject Premises 1** and get into ANDERSON'S **Gray Buick**. Investigating agents intercepted a call in which an unidentified individual appeared to be ordering narcotics from ANDERSON. ANDERSON and the unidentified individual discussed meeting in a parking lot. ANDERSON then drove the **Gray Buick**, with LUMONT in the passenger seat, to the rear of a motel in the 4400 block of East State Street. An investigating agent was able to get surveillance on ANDERSON'S vehicle, just as another car was pulling away from ANDERSON'S vehicle. Based on the intercepted communications and my training and experience, I believe that ANDERSON and LUMONT supplied the unidentified caller with narcotics shortly before the investigating agent arrived to conduct surveillance of the meeting.

199. On May 29, 2018, investigating agents intercepted a call between ANDERSON, using **Target Phone 1**, and HILL, using **Hill's Phone 1**, in which ANDERSON and HILL discussed "Skinny," which agents have identified as a nickname for LUMONT based on a combination of intercepted communications and surveillance.[27] During the call between ANDERSON and HILL, HILL asked if

---

[27] On May 28, 2018, for example, investigating agents intercepted a call between ANDERSON and LUMONT in which LUMONT talked about taking his car to his "mama's house" and told ANDERSON to have "Justin" call LUMONT. (TP1 Session 896) About 4 minutes later,

ANDERSON was with "Skinny." ANDERSON responded, "No, he's at work." HILL then said, "He (Skinny) just called me but I didn't understand what he was saying." ANDERSON responded, "He (Skinny) trying to, trying to goddammit, 28 it." HILL asked, "On which way, Christina?" I recognize Christina as a slang term for cocaine. ANDERSON responded, "Yep." ANDERSON and HILL then discussed how "he" (Skinny) was trying to "get it how [HILL] got it" and "put the ticket on" 28. I believe that HILL and ANDERSON were discussing how LUMONT was trying to get narcotics from HILL. HILL, however, stated, "[T]hey ain't got none. They still gone." ANDERSON asked if HILL had "wrapped it up, what [HILL] had," and HILL indicated that he had. HILL asked ANDERSON if ANDERSON was "done," and ANDERSON said, "Yea." I believe that ANDERSON and HILL were discussing how neither of them had an ounce (approximately 28 grams) of narcotics to sell to LUMONT at that time. (TP2 Session 273)

## III. CONCLUSION

200. Based on the above information, I submit that there is probable cause to issue criminal complaints and arrests warrants charging:

a. TYJUAN ANDERSON, also known as "Ace," LUMONT JOHNSON ("LUMONT"), also known as "Skinny," CLEVELAND JOHNSON ("CLEVELAND"), CHRISTOPHER ARNOLD, JUSTIN HILL, also known as "J Boo," and DAVID APPLETON, also known as "Boogie," with conspiring with each other

ANDERSON then received a call from HILL in which HILL stated, "Skinny said come get it from his mama house." (TP1 Session 898)

and with others known and unknown to knowingly and intentionally distribute and possess with intent to distribute a controlled substance, namely mixtures and substances containing a detectable amount of heroin, a Schedule I Controlled Substance, mixtures and substances containing a detectable amount of cocaine base, a Schedule II Controlled Substance, and mixtures and substances containing a detectable amount of cocaine, in violation of Title 21, United States Code, Section 841(a), all in violation of Title 21, United States Code, Section 846; and

b. ANGEL HERNANDEZ and CRISTOVAL SANTIAGO MEDINA with conspiring with each other and with others known and unknown to knowingly and intentionally distribute and possess with intent to distribute a controlled substance, namely mixtures and substances containing a detectable amount of heroin, a Schedule I Controlled Substance, in violation of Title 21, United States Code, Section 841(a), all in violation of Title 21, United States Code, Section 846.

FURTHER AFFIANT SAYETH NOT.

JEREMY K. SMITH
Special Agent, Federal Bureau of Investigation

SUBSCRIBED AND SWORN to before me on July 10, 2018.

IAIN D. JOHNSTON
United States Magistrate Judge